[No. 32190.  *En Banc.*  July 21, 1952.]

THE STATE OF WASHINGTON, *on the Relation of Public Utility District No. 1 of Pend Oreille County, Relator,* v. F. W. SCHWAB, *as Secretary of Public Utility District No. 1 of Pend Oreille County, Respondent,* CHESTER E. GREGG *et al., Interveners.*[1]

[1]Reported in 246 P. (2d) 1081.

*Clarence C. Dill* and *Trumbull & Ek,* for relator.
*Davis, Trezona, Chastek & Lorenz,* for respondent.
*J. K. Cheadle,* for interveners.

HAMLEY, J.—This case presents legal questions in connection with the proposal of public utility district No. 1 of Pend Oreille county to construct hydroelectric facilities at Box Canyon in that county.

The secretary of the district refused to attest and affix the seal of the district to a plan and system resolution for the construction and financing of this project. The district applied to the superior court for a writ of mandate to compel the secretary to perform these functions. Two taxpayers intervened in opposition to the application. After a trial of several days, the court entered judgment dismissing the application for writ of mandate. The matter comes here on a writ of certiorari.

The district was organized in 1936, but did not begin the distribution and sale of electric energy until February, 1948. It now serves Metaline Falls and Ione in the northern part of the county, and Newport, Dalkena and Diamond Lake in the southern part of the county. The district also has under condemnation, awaiting trial, the properties of the Washington Water Power Company at Cusick and Usk in the center of the county.

Since the beginning of its operation, the district has purchased all of its electric power from the Bonneville power administration. In 1950, however, the commissioners of the district became interested in the possible development of a hydroelectric project in Box Canyon, on the Pend Oreille river, in that county, as a future source of power. After some initial engineering studies, the district applied to the Federal power commission for a preliminary permit authorizing the district to make an engineering study of the project. This permit was granted on February 2, 1951.

The district then authorized the Harza Engineering Company of Chicago, Illinois, to undertake this study and make a project planning report. The district obtained a one hundred seventy-five thousand dollar loan from the community facilities branch of the housing and home finance agency to pay for the study. The Harza organization completed its study and filed its report in October, 1951. The

project was recommended as being feasible from an engineering standpoint and as being economically justified.

The FPC gave consideration to this report in considering the district's application, then on file, for a fifty-year license. The FPC also had before it two letters from the defense electric power administration urging the commission to give early and favorable consideration to the Box Canyon project. On February 7, 1952, the FPC issued its license for the construction, operation and maintenance of the dam.

The district then had an application pending before the Reconstruction Finance Corporation for a loan sufficient to refund outstanding bonds and finance construction of the Box Canyon facilities. While this application was pending, the defense electric power administration urged the district to expedite construction of the project. The district therefore proceeded to call for bids for the construction of the dam and power plant, without waiting for formal action on the RFC loan, although the district had received informal assurances that the loan would be granted.

The engineer's estimate on this part of the work was $8,046,660. The bids, when opened on March 27, 1952, ranged from $7,585,039 to $10,286,871. The low bid was therefore $461,621 below the estimate. The bids for the generators were opened May 8, 1952, and the low bid was $600,000 less than the engineer's estimates. The expiration dates for acceptance of these two bids were originally May 26, 1952, and August 6, 1952. However, the low bidder on the dam and power plant has extended the time for acceptance of that bid from May 26, 1952, to "within a week or ten days" after July 15, 1952.

In the meantime, on March 27, 1952, Chester E. Gregg and Otto White, the interveners in the present action, instituted an action in the superior court of that county to enjoin the district from issuing construction revenue bonds to finance the project. On the next day, March 28, 1952, RFC formally granted the district's application for a loan

of $17,541,000. This authorization is subject to a number of conditions, one of which reads as follows:

"The authority of the Issuer to carry out the Project and to issue the Bonds to finance it shall be upheld in a decision by the Supreme Court of the State of Washington, which decision shall also settle favorably any and all other legal questions regarding the Bonds, the Project or the System which may be presented for decision, as required by RFC Counsel, such decision to be satisfactory to RFC Counsel and Issuer's bond counsel."

On April 7, 1952, the district passed a plan and system resolution for the construction of the Box Canyon project, and for the issuance of revenue bonds in the amount of $17,541,000. Two of the district commissioners voted for this resolution. The third commissioner, F. W. Schwab, voted against it, and, as secretary of the district, declined to attest the resolution or to affix thereto the seal of the district. The application for writ of mandate, previously referred to, was filed on the next day. On May 19, 1952, the RFC counsel wrote to the district, advising it of the legal questions concerning which a ruling of this court was desired.

The mandamus action came on for trial on April 15, 1952, and hearings were held from time to time until June 2, 1952. On that day, the trial court handed down a memorandum opinion indicating that the application for a writ of mandate would be denied. Findings of fact and conclusions of law and a judgment denying the application were entered on the following day. Two days later, on June 5, 1952, the district's application for a writ of certiorari was filed with this court. The matter was argued before us, *En Banc*, on June 30, 1952.

We must first consider respondent's and interveners' joint motion to quash the writ of certiorari on the ground that relator has a plain, speedy and adequate remedy by appeal. This motion was argued at the same time that we heard the case on the merits.

It is the contention of respondent and interveners that the necessity of proceeding by writ of certiorari would have

been obviated if relator had instituted a declaratory judgment action in January, 1952, when it first learned that RFC entertained some question as to the district's authority, or if relator had developed these legal issues in connection with the injunction suit which Gregg and White instituted on March 27, 1952. Respondent and interveners further contend that, since the district proceeded to advertise for and open bids, after learning that legal questions had been raised, and prior to receiving formal RFC authorization, it is not in a position to urge that the "fruits" of such action will be lost if such litigation follows its normal course.

Trial court judgments may not be reviewed by certiorari where there is a plain, speedy and adequate remedy by appeal. *First National Bank of Everett v. Tiffany, ante* p. 193, 242 P. (2d) 169. The adequacy of the remedy by appeal does not depend upon the mere question of delay or expense. *State ex rel. Burkhard v. Superior Court,* 11 Wn. (2d) 600, 120 P. (2d) 477. Such inadequacy is shown only where it is apparent to this court that it will not be able to protect the rights of litigants or afford them adequate redress, otherwise than through use of one of the extraordinary writs. *State ex rel. Miller v. Superior Court,* 40 Wash. 555, 82 Pac. 877. Adequate redress by appeal does not exist where, by reason of the delay incidental to such procedure, the fruits of the litigation would be lost. *State ex rel. Smith v. Superior Court,* 26 Wash. 278, 66 Pac. 385.

The record here indicates that the low bids which have been received, as referred to above, are very favorable to the district, being approximately one million dollars below the estimates. There is evidence to indicate that if these bids must be rejected, the new bids obtained pursuant to readvertisement may be substantially higher. There is also evidence indicating that the delay incident to normal appeal procedure may, for engineering reasons, postpone completion of the project by a full year. In view of the present and prospective serious shortage of power in the Pacific northwest, as shown in the record, the district has a legitimate right to avoid such postponement, if possible.

The legal questions which had to be decided were not definitely known until the plan and system resolution was adopted. This resolution could not be adopted until the loan authorization was received from RFC. The authorization was granted on March 28, 1952; the resolution was adopted on April 7, 1952; and the application for writ of mandate was filed the following day. The mandamus action was therefore instituted as soon as reasonably possible, and it was expeditiously pursued.

While the district advertised for bids with full knowledge that certain legal questions had to be settled, and prior to received formal RFC authorization for the loan, its legal right to do so has not been questioned. Moreover, the district's action in this regard was in direct response to the insistent urging of the defense electric power administration.

In *Bayha v. Public Utility Dist. No. 1*, 2 Wn. (2d) 85, 97 P. (2d) 614, we permitted certiorari, where it appeared that the relator would otherwise lose the fruits of a contract it had entered into for the purchase of electric distribution properties in Aberdeen. In the instant case, the fruits of litigation which the district seeks to preserve are not executed contracts, but the asserted right to accept firm bids which, upon acceptance, will become valuable contracts. We think the writ should issue.

Relator's six assignments of error present the question of whether the trial court erred in finding and concluding that the proposed construction and operation of the Box Canyon project is unreasonably large and inappropriate to accomplish the primary purpose for which the district was formed, and therefore *ultra vires* because beyond the statutory authority and power of the district.

The test thus applied by the trial court in determining whether the district action would be *ultra vires* was sanctioned by this court in *Jones v. Centralia*, 157 Wash. 194, 226, 289 Pac. 3, and *State ex rel. P.U.D. No. 1 of Skagit County v. Wylie*, 28 Wn. (2d) 113, 150, 182 P. (2d) 706. In the latter case we said:

"The primary purpose of the power granted to a public utility district by subsection (d) of § 6, chapter 1, Laws of 1931 (Rem. Rev. Stat., § 11610(d)) is to furnish the district, and the inhabitants thereof, with electric current for all uses, and, as an incident thereto, it may furnish any other persons, including public and private corporations, within or without its limits, with such current for all uses.

"The right given, under subsection (d), to construct, condemn and purchase, purchase, and acquire plants, transmission and distribution lines, and facilities for generating electric current, is subject to the limitation that the facilities acquired must not be unreasonably large or entirely inappropriate for the accomplishment of that primary purpose."

The district's plan and system resolution does not contain a specific recital to the effect that the Box Canyon facilities will not be unreasonably large or entirely inappropriate to accomplish the primary purpose of furnishing the electric current required for consumption within the district. A reading of the resolution as a whole, and a consideration of the testimony of district officials regarding the purposes and objects of the project, indicate, however, that the commissioners of the district did, in effect, find and determine that the proposed facilities would not be unreasonably large or entirely inappropriate to accomplish such purpose.

It is conceded that this finding and determination would not be justified on the basis of the district's present power needs. The Box Canyon power plant, when completed, will be able to furnish prime power of 49,700 kilowatts. The annual primary energy which the plant will develop at a one hundred per cent load factor is 435,400,000 kilowatt-hours. The district could presently utilize no more than ten or twelve per cent of that primary capacity.

The commissioners must therefore have made the finding and determination referred to on the basis of anticipated future power load growth within the district. The record indicates that this is what was done. In 1950 the district prepared an estimate of future load growth extending from 1951 to 2002, when the FPC license would expire. Whereas actual sales in 1950 were 27,324,689 kilowatt-hours, the

estimate shows a gradual increase from 29,900,000 kilowatt-hours in 1951, to 69,000,000 kilowatt-hours in 1954. Under this estimate the district would thus be able to use about eighteen per cent of the Box Canyon output, when that project comes into operation in 1954.

The district estimate shows a further increase in load to 77,000,000 kilowatt-hours in 1955, and then a very sharp increase in the next two years. This sudden rise was predicated upon the assumption that an electrolytic zinc smelter would be built and placed into operation within the district in 1956 or 1957. The estimate therefore jumps from 77,000,000 kilowatt-hours in 1955 to 310,000,000 by 1957. The latter figure represents 71.3 per cent of the output of Box Canyon. The curve of estimated load increase then resumes a gradual rise, and indicates that, by 1970, all Box Canyon power would be needed in the district. According to this estimate, the district would have to look for additional sources of electric power after 1970. If the assumption that a smelter will be built in the district proves wrong, the estimate indicates that it will be 1986 before all Box Canyon power would be used in the district.

Based upon this estimate and in the exercise of their judgment and discretion, the commissioners in effect found and determined that the project would not be unreasonably large or entirely inappropriate to accomplish the primary purpose of serving the district and its inhabitants.

Respondent and interveners challenged this commission finding and determination in the trial court. They produced a great deal of evidence tending to contradict and undermine the facts and assumptions upon which the district estimate of load growth is based.

The trial court, after weighing all of the evidence bearing upon the correctness of the district's estimate, found that relator's estimates of load growth were mere opinion based upon pure speculation and great optimism, and not upon past experience and positive facts. The trial court further found that, under present conditions of normal load growth, it would be a great many years before the district would

consume fifty per cent of its own production of electric power, and it would be virtually impossible to predict when the district would be able to absorb seventy-five or one hundred per cent of its own production.

Relator's first assignment of error questions the propriety of the trial court reviewing the evidence and making findings of fact as to the future power requirements of the district. It is relator's position that this was a matter for determination by the district commissioners, and that their determination must be accepted unless shown to be the result of arbitrary or capricious action. Respondent and interveners, on the other hand, contend that it was the function of the court, in passing upon the question of whether the project was unreasonably large or entirely inappropriate, to weigh the evidence and make findings of fact as to future power load growth.

The consideration of this assignment of error necessarily includes a consideration of relator's sixth assignment of error, challenging the trial court's conclusion of law to the effect that the project would be *ultra vires* because unreasonably large and entirely inappropriate. If the trial court erred in undertaking to weigh the evidence and make its own finding of fact relative to prospective power requirements, and if the determination of the district commissioners regarding that matter was not arbitrary or capricious, then the conclusion of law referred to was erroneously entered.

It is the duty of the commissioners to make reasonable provision for the future requirements of the district. In order to discharge that duty, the commissioners must make a determination as to prospective load growth within the district. The commissioners, in making that determination, are not required to arbitrarily assume that future power needs would necessarily follow the normal rate of growth that had been experienced in the past. Intelligent planning compelled them to consider all factors tending to indicate that future load growth would set a new pattern. Among such factors are those which have a bearing upon

population growth, per capita use of electricity for domestic purposes, and the commercial, industrial and agricultural development of the area.

It is obvious that such a forecast of future conditions requires the exercise of judgment which cannot be immediately vindicated by positive proof. It is the commissioners of the district who are given the duty of exercising judgment in such matters. If they perform that duty, and if it is not shown that in doing so they acted arbitrarily or capriciously, or that they proceeded on a fundamentally wrong basis, their determination must be accepted by the courts in passing upon the question of whether the proposed project is unreasonably large or entirely inappropriate.

What has just been said regarding the function of the court in this case is consistent with the principle we have applied in all cases involving the exercise, by government officials, of the discretion vested in them by law. See *State ex rel. News Publishing Co. v. Milligan,* 3 Wash. 144, 151, 28 Pac. 369; *Columbia River T. & L. Co. v. Diking District,* 108 Wash. 148, 152, 183 Pac. 134; *Bayha v. Public Utility Dist. No. 1,* 2 Wn. (2d) 85, 117, 97 P. (2d) 614; *Robinson v. Olzendam,* 38 Wn. (2d) 30, 37, 227 P. (2d) 732; *Group Health etc. v. King County Medical Society,* 39 Wn. (2d) 586, 669, 237 P. (2d) 737.

We did not follow a different course in *State ex rel. P.U.D. No. 1 of Skagit County v. Wylie,* 28 Wn. (2d) 113, 182 P. (2d) 706. In that case the proposal was the purchase, by public utility district No. 1 of Skagit county, of all of Puget Sound Power and Light Company's generating, transmitting, and distributing facilities in eighteen counties, at a price of $135,000,000. Skagit district proposed to retain and operate all of the production facilities so purchased, representing $60,897,000 of the purchase price. Only the Baker river hydroelectric plant, representing 12.9 per cent of the production capability of the total plant being purchased, is located in Skagit county.

The Skagit district also proposed to retain distribution facilities, priced at $2,730,000, located in Skagit county. Skagit district planned to sell distribution facilities located outside Skagit county, and priced at $29,003,000, to other public utility districts. Additional outside distribution facilities, located in six other counties, and priced at $42,370,-000, would be retained and operated by Skagit district until sales to local public utility districts could be arranged. Of the total number of customers served by the facilities proposed to be purchased, less than five per cent were located in the Skagit district.

The commissioners of the Skagit district made no claim that the facilities being purchased were reasonable and appropriate for the purpose of meeting the primary needs of that district. Obviously they could not have made such a determination, and had they done so, it would have manifested arbitrary and capricious action. Hence, when we found, in that case, that the project was unreasonably large and entirely inappropriate, we were not passing upon any finding which the commissioners had made as to that district's future needs. The project there in contemplation was not sponsored on the basis of the future power needs of Skagit county.

In the instant case it is to be noted that, with respect to all questions of fact regarding feasibility and costs, the trial court considered that its function was limited to that of determining whether the action of the district was arbitrary or capricious. As above indicated, it is our view that the trial court should have pursued the same course in dealing with the question of the future power needs of the district and its inhabitants. Many of the same engineers, rate experts and district officials gave evidence regarding future power needs as gave evidence regarding engineering feasibility and costs. We perceive no reason why the district commissioners' acceptance of their views is subject to court review only for arbitrary or capricious action in one case, but not in the other.

■ There remains for consideration, on this branch of the case, the question of whether the determination of the commissioners relative to future power needs was the result of arbitrary or capricious action or indicates that the commissioners proceeded on a fundamentally wrong basis.

The trial court made no finding or conclusion to that effect, and our review of the record discloses no basis for such a finding or conclusion. The district estimate was the result of studies and surveys made by qualified engineers and other experts. These studies and surveys made use of many sources of information and previous expressions of expert opinion. Among these additional sources were the studies and investigations of the Colville Engineering Company, United States bureau of mines, Bonneville power administration, rural electric administration, and Harza Engineering Company.

With respect to the curve of growth for the years 1951 to 1955, the estimate was based upon existing contract commitments for present and future power supply and projection of normal rate of growth. The district's estimate for these years is more conservative than the individual estimates of some experts. The actual load for 1951 exceeded the district estimate for that year by eighteen per cent.

The sharp increase in the estimated load between 1955 and 1957 was, as before indicated, predicated upon the assumption that an electrolytic zinc smelter would be built and put into operation within the district. This assumption was based upon studies of mineral resources, present and proposed zinc and lead mining production and development, cost of smelting within the district as compared to the cost of shipping concentrates elsewhere for smelting, manufacture of by-products of the smelting process, and other factors. District representatives also interviewed officials of leading mining companies operating in the county as to the likelihood that a smelter would be built.

The estimated rate of increase for the years 1957 to 1971 is about parallel to the rate of increase for the years 1951 to 1955, and was based upon normal requirements of an

increasing population and normal growth of business and industry. The district estimate for the entire period is more conservative than that made by Harza Engineering Company. That organization concluded that all Box Canyon power would be used in the district by 1965.

Respondent and interveners, as before indicated, produced a great deal of evidence tending to contradict or undermine the district's estimate of future load growth. Perhaps the most effective evidence of this kind was the testimony of two officials of companies which have a controlling interest in Pend Oreille Mines & Metals Company. They expressed grave doubt that Pend Oreille Mines & Metals Company would expend the fifteen million dollars necessary to construct a smelter in Pend Oreille county for the reduction of zinc and lead. The evidence produced by respondent and interveners indicates that the district commissioners may very well be incorrect in their estimate of future power needs. It does not, in our opinion, indicate that, in making that determination, they proceeded in an arbitrary and capricious manner.

Nor do we find any basis for concluding that the commissioners proceeded on a fundamentally wrong basis. They were entitled, and in fact duty bound, to make reasonable provision for future power needs. In the *Skagit* case, *supra*, we intimated that the Skagit district would be warranted in acquiring both the Baker river and Rock Island generating plants "to adequately meet present and future ascertainable needs of the district and the inhabitants thereof . . . ."

How far the district commissioners should look into the future is again a matter of judgment. Certainly the year 1971—nineteen years from now—is not too far for them to look ahead. Nor can we say, as a matter of law, that the year 1986, when, it was estimated, all Box Canyon power could be used by the district even if the smelter were not built, is too far for the commissioners to look ahead.

In the *Skagit* case, *supra*, the evidence showed that the Baker river plant, located within the district, had a capa-

city of 360,036,000 kilowatt-hours annually, as compared to the then-existing need of the district for 71,511,955 kilowatt-hours annually. The Rock Island plant, located outside the district, had a capacity of about twice that of the Baker river plant. Thus, the two plants together had a capacity roughly equal to fifteen times the then-existing needs of the district. Yet, as noted above, we intimated in the *Skagit* opinion that the district might have been warranted in purchasing those two plants to meet present and future ascertainable needs. The *Skagit* opinion therefore constitutes tacit sanction of long-range purchase and construction programs.

But, in any event, these dates (1971 and 1986), fixed in the district estimate, represent only the expected times (depending on whether or not the smelter is built) when all Box Canyon power would be used within the district. The statutes under which the district commissioners obtain their authority, however, do not require that facilities be limited to those which can ultimately be devoted exclusively to serving district customers. If the primary purpose of the facility is to serve the district, it is immaterial if a portion of the power produced must be disposed of, outside the district, for an indefinite period. This is particularly true where, as here, the source of power being developed is located within the district.

The district was precluded, by engineering and economic factors, and by order of the FPC, from building the Box Canyon project at all, unless built to the full capacity here proposed. The commissioners concluded that a substantial portion of that power could be used within the district in the next few years, and that the surplus could be marketed elsewhere at a profit. This sufficiently establishes that the prime purpose of the project is to serve consumers within the district.

In view of the foregoing considerations, it is our conclusion that the trial court erred in finding and concluding that the proposed construction and operation of Box Canyon project is. *ultra vires* because unreasonably large and en-

tirely inappropriate to accomplish the primary purpose of serving customers located within the district.

Interveners argue that if the trial court judgment is not sustained on the ground advanced by that court, and discussed above, it must nevertheless be sustained on other grounds. Interveners are entitled to raise such additional questions, even though they have not cross-appealed, for the ruling of the trial court will be sustained if it is correct upon any ground. *Rawlins v. Nelson,* 38 Wn. (2d) 570, 578, 231 P. (2d) 281; *Heinlen v. Martin Miller Orchards, ante* p. 356, 242 P. (2d) 1054.

One of the additional grounds thus advanced in support of the judgment is that, in respects other than those previously discussed, the commissioners acted arbitrarily and capriciously, and proceeded on a fundamentally wrong basis, in adopting the plan and system resolution.

The trial court found to the contrary, as indicated by finding No. XV, which reads as follows:

"That Relator District's Commissioners, in their action relating to the proposed Box Canyon Project, acted upon their own independent inquiry and upon the advice and judgment of competent engineers; and that even though they may not be able to construct the dam and power plant, as contemplated, for $16,000,000.00, and even though they have underestimated the amount of monetary damages to the flooded areas; and even though the ultimate cost of power delivered to the consumers after the plant is in operation, will far exceed the rate the consumers now enjoy under the purchase by the Relator District of power from the Bonneville Power Administration; and even though the Commissioners may be in error in all the matters raised by the Respondent and the Intervenors concerning feasibility and cost, yet said Commissioners reached each of those decisions honestly and in good faith and in exercise of the sound discretion vested in the Relator District Commissioners."

In asking us to reach an opposite conclusion, interveners assert that the size of this project is out of all proportion to the assessed valuation and population of the county; that power produced at Box Canyon will cost more than power

now being supplied by Bonneville power administration; that Bonneville power administration provides an adequate and assured source of power and will be able to meet the future power needs of the district; that there is no assurance that a market can be found for surplus Box Canyon power; that, if the commissioners are permitted to go forward with that project, it is probable that the district will experience pyramiding rate increases; and that, as a result, the district may have to exercise its power to levy a two-mill *ad valorem* tax.

There is considerable evidence to support these contentions. It is sufficient, indeed, to raise a serious question as to whether the commissioners have made a wise decision in adopting the plan and system resolution. There is a substantial basis for believing that the proposal in question may redound to the ultimate detriment of the district. But that is not enough to establish arbitrary and capricious action where the matters in question call for the exercise of judgment and discretion, and for the determination and application of broad policies of management and administration. To establish arbitrary and capricious action under such circumstances, it must be shown that the commissioners proceeded without due deliberation and in defiance of practically uncontradicted factual and opinion evidence dictating a contrary course, or that they were actuated by wholly improper motives.

No such showing was made here. The factual and opinion evidence was in sharp conflict on each of the points in question, and there is substantial support therein for the viewpoint adopted by the commissioners. The commissioners made studies, extending over a period of two years or more; obtained the advice of independent experts; and conducted a public hearing to obtain an expression of opinion by the people of the district. They concerned themselves not only with the primary engineering and economic problems connected with the project, but also with such collateral problems as the flood damage which would be caused by the Box Canyon reservoir, and the encroachment of such reservoir

upon the tailwater of the hydroelectric plant at Albeni Falls. They made certain that Bonneville power administration would release the district from its twenty-year contract. They obtained assurance from that agency that secondary power could be obtained, when necessary, to "firm up" Box Canyon power; and that surplus power from Box Canyon could be wheeled over Bonneville transmission lines to customers outside the county.

It is also our opinion that the decision made by the commissioners is not indicative of whim, caprice, or any improper motive. The decision was consistent with the policy of the commissioners to gain substantial independence of outside sources of power by developing a source of power available within the district, and the policy of encouraging the development of the district's mineral resources by providing, in advance, an adequate supply of firm local power. It is not our function to say whether these policies are far-sighted or short-sighted. We do hold that they are not improper as a matter of law.

■ It is accordingly our conclusion that the trial court did not err in finding, in these matters, an absence of arbitrary or capricious action. For the same reasons, it is our view that the district did not proceed on a fundamentally wrong basis.

The final argument advanced by respondent and interveners why the judgment should be sustained has to do with the provisions of the plan and system resolution relative to the interest rate on the refunding bonds. It is contended that the provisions in question violate RCW 54.24-.090 (Rem. Supp. 1941, § 11611-8), which provides:

"  . . .  The coupon rate of interest on funding or refunding bonds shall not exceed the coupon rate of interest on the warrants and bonds funded or refunded thereby.
. . . "

The plan and system resolution provides for the issuance of $17,541,000 in electric revenue bonds. Of this amount, $16,750,000 is to be used solely for working capital and construction costs on the Box Canyon project. The remaining

$791,000 in bonds is to be used solely to refund $791,000 in existing outstanding bonds of the district. The avowed purpose of the district in refunding the existing bonds is to simplify its financial affairs by having but one outstanding bonded indebtedness.

The existing bonds which would be refunded under this plan are the 791 one-thousand-dollar revenue bonds of the district's 1949 issue which will still be outstanding on December 1, 1954. Those bonds bear interest ranging from two per cent to 3.4 per cent, and will not mature until 1979 (twenty-five years after 1954). The interest which will accrue during that period on these bonds to be refunded will be $373,263.

The 791 one-thousand-dollar bonds of the proposed new issue, which are specifically earmarked for refunding purposes, bear two per cent interest. They will be issued in 1954, and will mature in groups during the following three years, so that the $791,000 of refunding bonds will have been entirely amortized by 1957. During this period, the interest which will accrue on these refunding bonds will be $32,420. A three per cent premium must be paid for refunding the present bonds, the total cost of which will be $23,730. Adding this premium cost to the interest which will accrue on the refunding bonds, and deducting that total from the interest which the district must pay on the present bonds from 1954 to maturity, if not refunded, the indicated interest saving to the district by this refunding plan is $317,113.

The remainder of the proposed issue consists of 16,750 one-thousand-dollar bonds, maturing in groups from 1958 to 1986, and all earmarked for working capital and construction costs. These 16,750 construction bonds are divided into two groups: 15,959 bearing four per cent interest, and 791 bearing six per cent interest until an equal number of refunding bonds have matured, at which the interest rate drops to four per cent. It is therefore indicated that the time during which these 791 bonds will carry six per cent interest is definitely integrated with the time during

which the 791 refunding bonds, bearing two per cent interest, are outstanding. It is further indicated that, under the provisions described above, the over-all average interest rate on the entire $17,541,000 will be four per cent. The extra interest represented by the period during which 791 construction bonds carry six per cent interest instead of four per cent interest will total $32,420. Deducting this amount from the $317,113 saving in interest which the district will make by refunding the outstanding bonds, the net saving would thus be $284,693.

Pointing to the asserted "tie-in" between the two per cent interest rate on the refunding bonds and the six per cent interest rate on an equal amount of the construction bonds, and calling attention to the over-all average interest rate of four per cent, respondent and interveners contend that the interest rate on the refunding bonds must be held to exceed the two per cent to 3.4 per cent interest rate on the bonds being refunded, in violation of the statute quoted above.

The trial court did not agree with that contention, and entered a formal conclusion of law to the effect that the provisions of the plan and system resolution relative to interest payments on bonds did not violate RCW 54.24.090 (Rem. Supp. 1941, § 11611-8).

In addition to the statute just referred to and which is quoted earlier in this opinion, the following statute is pertinent:

"Sale of Revenue Obligations. Utility revenue bonds or warrants shall be sold in such manner and for such price as the commission deems for the best interest of the district: *Provided*, That the aggregate interest cost to maturity of the money received for such an issue shall not exceed six percent per annum  . . ." RCW 54.24.060 (Rem. Supp. 1941, § 11611-4)

It is therefore clear that, in providing for an interest rate of slightly more than four per cent on the construction bonds portion of the proposed issue (the interest exceeds four per cent to the extent that it is affected by the temporary six per cent rate on $791,000 of such bonds), the

commissioners were well within the statutory limit of six per cent. Had the construction bond portion of this issue, amounting to $16,750,000, not been divided into two groups, as described above, and had the resolution provided that these bonds would carry 4¼ per cent interest (or whatever fraction above four per cent might be necessary to average out the entire $17,541,000 bond issue at four per cent), there would be no basis for contending that RCW 54.24.090 had been violated. That statute provides that bonds specifically earmarked for refunding may not bear a higher rate than the bonds being refunded. It does not prevent the district from issuing, concurrently with the refunding bonds, construction bonds carrying such interest rate that the over-all interest rate exceeds that on the bonds being refunded.

The question then remains whether a different conclusion must be reached because of the obvious integration between the interest rate on the refunding bonds and on the part of the issue of construction bonds. We think not. Respondent and interveners assert that this permits the district to do indirectly what it may not do directly. On the contrary, it appears to us that the district was merely doing indirectly what it could have done directly, and that what it did was entirely in keeping with the spirit and purpose of the act. The district could have provided an interest rate up to six per cent on the construction bonds. It chose, instead, to hold that rate to only slightly above four per cent, so that the average of the two issues would be exactly four per cent. The fact that this was accomplished in the manner described rather than by the direct method of specifying an over-all construction bond interest rate in excess of four per cent, is immaterial.

The important consideration is whether the interest rate on the bonds specifically earmarked for refunding purposes exceeds that of the bonds being refunded. These refunding bonds do not violate that requirement, and the statute is therefore satisfied.

We need not now decide whether circumstances could be stated under which the courts would examine the asserted "tie-in" provisions between two bond issues for the purpose of determining whether there had been a violation of RCW 54.24.090. The clear purpose of the legislature in enacting this statute was to make it unlawful for a public utility district to authorize a refunding issue which would result in burdening the district with greater aggregate interest than would be paid out on the outstanding bonds if not refunded. If the record showed that this purpose was being disregarded in the present case, there might be merit in respondent's and interveners' contention.

Here, however, the significant fact is that outstanding bonds which will not mature for twenty-five years are being refunded by bonds, bearing a smaller interest rate, which will mature in three years. The saving in aggregate interest, after allowing for the premium cost of calling the present bonds, is $317,113, and if the excess interest rate (over four per cent) on the 791 construction bonds is taken into account, the saving to the district will still be $284,693. Hence, neither the letter of the statute nor its basic spirit and purpose was violated; on the contrary, the refunding bonds are specifically limited to an interest rate substantially below that of the bonds being refunded, and the refunding operation, considered as a whole, will greatly lessen the district's aggregate interest burden on the outstanding bonds.

In our opinion, the trial court did not err in concluding that the provisions of the plan and system resolution relative to interest payments on bonds did not violate the statute in question.

The judgment is reversed and the cause remanded, with directions to issue the writ of mandate. The remittitur will go down forthwith.

MALLERY, HILL, GRADY, and FINLEY, JJ., concur.

SCHWELLENBACH, C. J. (concurring in the result)—I concur in the result arrived at by the majority, but upon a different basis. As to whether or not the commissioners acted arbitrarily and capriciously in adopting the plan and sys-

tem resolution, the trial court found that even though the commissioners may be in error, yet they reached their decisions honestly and in good faith and in exercise of the sound discretion vested in them. In other words, as to that question, the district commissioners did not act arbitrarily or capriciously.

However, the question was also raised that in attempting to build this dam, the commissioners are acting beyond the scope of the powers granted to them under the public utility district act, and that their proposed actions would be *ultra vires*.

That places a legal question squarely before the court for determination. In arriving at such determination the question before the court is not whether the commissioners are acting either in good faith or arbitrarily, but whether or not they have a right under the law to do what they are attempting to do. The commissioners cannot preclude the court from going into the entire record for the purpose of deciding this question, by saying: "We have already decided it, and you cannot go back of our decision unless we acted arbitrarily or capriciously."

I feel that the majority used an entirely wrong basis in determining this purely legal question. However, from an examination of the record, I am convinced that the commissioners are not acting without the scope of the authority granted to them under the Public Utility District Act, and feel that the trial court should be reversed.

DONWORTH, J. (concurring in part and dissenting in part) —I concur in all of the majority opinion except the latter portion which pertains to the interest arrangement with respect to the refunding of bonds.

The RFC commitment to purchase the $16,750,000 of construction bonds is conditioned as to the interest arrangement in substance as follows:

1. The outstanding bonds ($791,000) must be refunded so that the entire new issue ($17,541,000) shall be a first lien on the gross revenues of the district.

2. In order to comply with the statute (RCW 54.24.090) providing that the coupon interest rate on refunding bonds shall not exceed the coupon interest rate on the bonds to be refunded, the district must increase the rate of interest on a portion of the construction bonds ($16,750,000) from four per cent to six per cent for such period of time as will compensate the RFC for the loss of interest on the refunding bonds. The *average* rate of interest on the entire new issue is to be four per cent per annum.

3. The district must procure an adjudication of the supreme court of the state of Washington holding that this procedure is legal, "such decision to be satisfactory to RFC counsel" and the district's bond counsel.

The ostensible purpose of this proposal is to compel the district to do indirectly what it may not do directly, to wit, pay four per cent interest on bonds issued to refund outstanding bonds bearing a coupon rate of 2 to 3.4 per cent.

There is no doubt that under RCW 54.24.060 the commission is given power to sell bonds "in such manner and for such price" as it deems for the best interest of the district subject only to the limitation that the cost of the money to maturity shall not exceed six per cent per annum. Under this section of the statute, the commission could sell all of the construction bonds for any price it deemed proper so long as the money borrowed did not cost the district more than six per cent per annum.

However, when we consider the provisions of RCW 54.24-.090, the problem becomes more complicated. This section provides:

"When a district has outstanding utility revenue warrants or bonds, the commission may, by resolution provide for the issuance of funding or refunding bonds with which to refund the outstanding warrants or bonds or any part thereof at maturity, or before maturity if they are by their terms or by other agreement subject to call for prior redemption, with the right in the commission to combine various series and issues of the outstanding warrants or bonds by a single issue of funding or refunding bonds. The funding or refunding bonds shall be payable only out of a special fund created out of the gross revenue of the public utility, and

shall only be a valid claim as against such special fund and the amount of the revenue of the utility pledged to the fund. The coupon rate of interest on funding or refunding bonds shall not exceed the coupon rate of interest on the warrants and bonds funded or refunded thereby. The commission may exchange the funding or refunding bonds at par for the warrants or bonds which are being funded or refunded, or it may sell them *in such manner* as it deems for the best interest of the district. The funding or refunding bonds shall, except as specifically provided in this section, be issued in accordance with the provisions with respect to utility revenue bonds and warrants." (Italics mine.)

The italicized portion of this section relating to refunding bonds differs materially from RCW 54.24.060 relating to construction bonds in that the words "and for such price" are omitted.

Under the provisions of RCW 54.24.090, refunding bonds bearing the same coupon rate of interest as the bonds to be refunded may be disposed of in either of two ways: (1) by exchanging them for the outstanding bonds or (2) by selling them "in such manner as it [the commission] deems for the best interest of the district" and using the proceeds to pay the outstanding bonds.

If the latter method is pursued (as is proposed here) the statute contemplates that the interest rate or cost of the money shall not exceed the coupon rate on the outstanding bonds.

The RFC commitment says, in effect, that it will buy the refunding bonds bearing interest at the rate of two per cent *only if* the district will increase the four per cent interest rate on a portion of the construction bonds (which rate is satisfactory to the RFC) to six per cent until the difference in the amount of interest received is equal to the loss of interest occasioned by its buying the refunding bonds. In addition, the RFC requires that we approve this transaction by a decision satisfactory to its counsel.

In my opinion, the contemplated procedure constitutes a clear violation of the plain meaning of RCW 54.24.090. The RFC, as a condition precedent to purchasing the construction bonds, exacts additional interest to compensate

for the loss on the refunding bonds. The effect of the arrangement is to increase the coupon rate of interest on the refunding bonds over that payable on the bonds refunded. This is the very thing that the statute was intended to prevent.

The majority approves this transaction on the ground that RCW 54.24.060 authorizes the sale of construction bonds at any price satisfactory to the commission as long as the money does not cost more than six per cent per annum. Therefore, since the commission could have sold the construction bonds bearing the interest rates proposed in the commitment, it may carry out this arrangement.

This argument does not, to my mind, answer the problem. Here, the RFC says, in substance, to the district: "We won't buy *any* bonds unless you compensate us for buying your refunding bonds by paying us an equivalent amount of additional interest on the construction bonds." The effect is to force the district to do indirectly what the statute says it may not do directly. To hold that, because the refunding bonds on their face do not bear a coupon rate in excess of that borne by the outstanding bonds, we should approve this arrangement is to shut our eyes to the realities of the situation shown by the RFC commitment.

As this court has often stated, municipal corporations are merely creatures of legislative enactment and the powers of their officers are subject to such limitations as the legislature may see fit to impose. *Misich v. McGuire*, 24 Wn. (2d) 758, 167 P. (2d) 462. This principle is applicable to the present case.

Being of the opinion that the proposed arrangement for the purchase of these bonds constitutes a violation of the provisions of RCW 54.24.090, I am constrained to dissent from that portion of the majority opinion which approves it.

Since an emergency appears to exist in connection with the acceptance of certain contractors' bids, I consent that the remittitur be sent to the trial court forthwith upon the filing of the opinion.

WEAVER and OLSON, JJ., concur with DONWORTH, J.