[No. 36486.    En Banc.    July 12, 1962.]

ROBERT R. BEEZER, *Appellant,* v. THE CITY OF SEATTLE *et al.,*
*Respondents,* PUBLIC UTILITY DISTRICT No. 1 OF PEND
OREILLE COUNTY, *Intervenor-appellant.**

*Alfred J. Schweppe* and *Fredric C. Tausend,* for appellant.

*A. C. Van Soelen, A. L. Newbould, Richard S. White,* and
*Richard W. Bartke,* for respondents.

*Clarence C. Dill* and *Lloyd W. Ek,* for intervenor.

HILL, J.—The issue presented is another and, as yet, un-
explored facet of the obligation of a municipal corporation,
existing under and by virtue of the laws of the state of
Washington, to comply with the laws of that state.

The city of Seattle has applied for and received a license

*Reported in 373 P. (2d) 796.

from the Federal Power Commission for the development of a hydroelectric project on the Pend Oreille River (referred to herein as the Boundary project), and involving the construction of a dam on a site presently owned by Public Utility District No. 1 of Pend Oreille County. (It is conceded that the city intends to condemn this and other property of the P.U.D.)

In 1930, the people of this state adopted, by the initiative, the public-utility-district law,

" . . . to conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses." Laws of 1931, chapter 1, § 1, p. 3.

As adopted, it contained, and still does, a provision forbidding a district created thereunder from condemning any public utility owned by a city or town (RCW 54.16.020).

In 1933, the legislature made the prohibition work both ways by forbidding any city or town from acquiring by condemnation,

" . . . the electric power and light plant or electric system, or any part thereof, belonging to or owned or operated . . . by a public utility district." RCW 35.84.030[1]

This is a declaratory judgment action predicated on the proposition that the city of Seattle, faced with this express prohibition, cannot acquire by condemnation the property of Public Utility District No. 1 of Pend Oreille County; and, consequently, should be enjoined from the expenditure of

---

[1]"Every city or town owning its own electric power and light plant may exercise the power of eminent domain as provided by law for the condemnation of private property for any of the corporate uses or purposes of the city or town: *Provided*, That no city or town shall acquire, by purchase or condemnation, any publicly or privately owned electric power and light plant or electric system located in any other city or town except with the approval of a majority of the qualified electors of the city or town in which the property to be acquired is situated; nor shall any city or town acquire by condemnation the electric power and light plant or electric system, or any part thereof, belonging to or owned or operated by any municipal corporation, mutual, nonprofit, or cooperative association or organization, or by a public utility district." RCW 35.84.030

money in the furtherance of a project which it cannot complete.

The trial court entered a summary judgment dismissing the action, apparently believing that the issue had been determined in the prior litigation involving the right of the city of Tacoma to build dams on the Cowlitz River.[2]

██ We do not regard anything actually decided in the Cowlitz litigation as decisive of the present case. In the first place, it was conceded that when the city of Tacoma received its license to proceed with the Cowlitz project and construct the necessary dams, there was nothing limiting its authority so to do. Here, the city of Seattle, at the time it applied for its license to proceed with the Boundary project, had a known and express limitation on its power, *i.e.*, it could not condemn

" . . . the electric power and light plant or electric system, or any part thereof, belonging to or owned or operated . . . by a public utility district."

This was not necessarily a disqualification as a licensee, because it was entirely possible, and for a time appeared probable, that the city would acquire by mutual agreement with the P.U.D. the property it required.

In the second place, it has been, and is, our view that the Supreme Court of the United States in *Tacoma v. Taxpayers* (1958), 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209, did not pass upon the proposition which we deemed decisive in our second Cowlitz case (*Tacoma v. Taxpayers* (1957), 49 Wn. (2d) 781, 307 P. (2d) 567), *i.e.*, that the federal government may not confer powers upon local units of government created by the state beyond the capacity given them by their creator. The Supreme Court of

---

[2]In chronological reverse order the decisions are: *Tacoma v. Taxpayers* (1962), *ante* p. 66, 371 P. (2d) 938 (our third Cowlitz case); *Tacoma v. Taxpayers* (1958), 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209; *Tacoma v. Taxpayers* (1957), 49 Wn. (2d) 781, 307 P. (2d) 567 (our second Cowlitz case); *Tacoma v. Taxpayers* (1953), 43 Wn. (2d) 468, 262 P. (2d) 214 (our first Cowlitz case); *State of Washington Department of Game v. Federal Power Comm.* (1953), 207 F. (2d) 391 (C. A. 9th).

the United States reversed our decision in that case on the basis of res judicata, stating that the state of Washington and its citizens were foreclosed by the judgment in the Court of Appeals (*State of Washington Department of Game v. Federal Power Comm.* (1953), 207 F. (2d) 391 (C. A. 9th)), from litigating further the power and authority of the city of Tacoma to proceed under its Federal Power Commission license to build dams. (In the present case, it is urged that the federal government, through the Federal Power Commission, may confer upon the city of Seattle, through its license, powers which the city was expressly prohibited by state statute from exercising at the time it made its application for a license to proceed with the Boundary project.)

The city of Seattle's power of eminent domain has been at all times, since the effective date of RCW 35.84.030, *i.e.*, 1933, subject to the prohibition set forth in that act (heretofore quoted in note 1). This is clearly a declaration of the public policy of the state, dating back thirty years, and is in no sense an attempt to exercise a veto over said project.

■ Whether the Federal Power Commission can confer powers of condemnation on cities, which the state legislature has, as a matter of policy, expressly prohibited, the federal courts must determine. If the city of Seattle could accept such a license only subject to an existing express statutory prohibition, which precluded its condemnation of P.U.D. property of the character described in RCW 35-.84.030, then it is indisputable that a controversy exists which must be determined in accordance with the law of the state of Washington; and neither the Federal Power Commission nor the federal courts can make a conclusive determination on that point. That controversy is whether the property of the P.U.D., which the city of Seattle concedes it intends to condemn, is within the statutory prohibition, *i.e.*, is an "electric power and light plant or electric system, or any part thereof." We are here concerned with the interpretation and application of state law, and our courts should not hesitate to proceed with that interpretation and application.

We, therefore, set aside the summary judgment of dismissal, and direct the trial court to proceed with the determination of whether the property of the P.U.D., which the city of Seattle now takes the position it must condemn, is an "electric power and light plant or electric system, or any part thereof." If it is not, the action should be dismissed and the city left free to proceed to exercise its power of condemnation. If it is, we do not presume to suggest to the trial court what its action should be, because, as we have indicated, the city may find that if it has no power of condemnation, it may still be possible to acquire the property by negotiation and proceed under its license; and it should not be precluded from so doing.

WEAVER, ROSELLINI, OTT, FOSTER, and HUNTER, JJ., concur.

DONWORTH, J. (dissenting)—In order to understand the principal issue involved in this case it is necessary to state the history of the dispute rather fully. The principal litigants are the city of Seattle (herein called the city), which desires to construct a dam on the Pend Oreille River, a navigable stream in northeastern Washington, for the development of a hydroelectric project (referred to as the Boundary project) and Public Utility District No. 1 of Pend Oreille County (herein referred to as the P.U.D.), which desires to develop a hydroelectric project on land owned by it on the same river at Z Canyon, which is about a mile upstream from the location of the city's proposed dam.

A brief chronological statement of proceedings material to our consideration of this case follows:

October, 1953—The city applied to the Federal Power Commission (herein called the F.P.C.) for a preliminary permit for the hydroelectric project above referred to (designated as Project No. 2144). Notice thereof was duly published.

January, 1954—The P.U.D. timely filed with the F.P.C. a petition in intervention in opposition to the issuance of the preliminary permit on several grounds, including the contention that RCW 35.84.030 was an absolute prohibition against the condemnation by the city of the P.U.D.'s prop-

erty. This petition to intervene was granted February 5, 1954. No other person petitioned to intervene in this proceeding.

August 30, 1954—A three-year preliminary permit was issued to the city.

July 29, 1957—The city filed an application for a license to construct the proposed Boundary dam. Notice thereof was duly published.

August, 1957—The P.U.D. again petitioned the F.P.C. for leave to intervene, raising the contention that, for the reason stated above, RCW 35.84.030 prevented the city from performing under a license, if granted. Permission to intervene was granted October 7, 1957.

September 5, 1958—The P.U.D. filed an application for a license to construct a dam on the Pend Oreille River about a mile upstream from the location of the city's proposed dam. The P.U.D.'s project was designated as Project No. 2250. The city's petition to intervene in this proceeding was granted.

October 20, 1958—The F.P.C. entered an order consolidating both projects for hearing. Since these two projects overlapped to such an extent that a license could not be granted to each applicant, the F.P.C., under § 7(a) of the Federal Power Act, was required to decide which project (if either) complied with the criteria prescribed by the act for the development of the Pend Oreille River.

December 1, 1958—The P.U.D. moved for the dismissal of the city's application for a license regarding Project No. 2144 on the ground that the city was without legal capacity to apply for or receive such license because "the laws of the State of Washington expressly prohibit Seattle from acquiring such properties of the District by condemnation." This motion to dismiss was passed for consideration until after the hearing on the merits.

January 15, 1959 to February 23, 1960—Hearings were held from time to time before an examiner at which testimony and documentary evidence were received as to the merits of the two projects. In the city's brief in this court it is stated that these hearings consumed 126 days and pro-

duced a transcript consisting of 17,228 pages, and that some 450 exhibits were introduced in evidence at the hearings.

March 10, 1961—The examiner who presided at the consolidated hearings filed his decision, in which he denied the P.U.D.'s motion to dismiss the city's application for a license (based on RCW 35.84.030) and recommended that a license be issued to the city for Project No. 2144. The examiner's · decision included the following statement:

"It is further concluded that upon the conditions set out in the order issued herewith, the project proposed by the City of Seattle for construction, maintenance and operation at the Boundary site on the Pend Oreille River is best adapted to a comprehensive plan for improving and developing the reach of the Pend Oreille River between Project No. 2042 [Box Canyon dam owned and operated by PUD[3]] and the United States-Canadian border."

The examiner further stated that the P.U.D. had failed to produce probative and convincing evidence that there was, or in the near future would be, a market for a substantial portion of the electric power which would be produced by Project No. 2250.

The P.U.D. filed objections to the examiner's decision. The objections included the P.U.D.'s argument that the city could not perform under its license (if issued) because of RCW 35.84.030.

July 10, 1961—After oral argument before the members of the F.P.C., the Commission issued its order granting a license to the city for Project No. 2144 and dismissing the P.U.D.'s application for a license for Project No. 2250. The Commission adopted the examiner's decision (as modified by its order) as the decision of the Commission. Its decision included the following finding:

"(4) Seattle is a municipality within the meaning of Section 3(7) of the Act, and has submitted satisfactory

[3]The Box Canyon dam (Project No. 2042) is located on the Pend Oreille River about fifteen miles upstream from the site of the proposed Z Canyon dam (Project No. 2250), for the construction of which the P.U.D. was seeking a license from the F.P.C. and for which its application was dismissed by the Commission's order of July 10, 1961. The Box Canyon dam was involved in *State ex rel. P.U.D. No. 1 v. Schwab,* 40 Wn. (2d) 814, 246 P. (2d) 1081 (1952).

evidence of compliance with the requirements of all applicable state laws insofar as necessary to effect the purposes of a license for Project No. 2144."

August 8, 1961—The P.U.D. filed with the Commission a petition for a rehearing, again raising the question of the city's inability to condemn its property because of RCW 35.84.030.

September 6, 1961—This petition for rehearing was denied by further opinion and order of the Commission. Concerning the power of the city to condemn the P.U.D.'s property and the city's compliance with § 9(b) of the Federal Power Act, the Commission said:

"PUD contends that the Commission erred in adopting the examiner's discussion and disposition of the issue as to whether Seattle has power to acquire by condemnation lands belonging to PUD and necessary for Seattle to effect the purposes of the license issued to it. The examiner denied PUD's motion to dismiss Seattle's application because of its inability to comply with the requirements of Section 9(b) of the Federal Power Act, and concluded that should Seattle receive a license, its power to acquire the properties in question is clear under *City of Tacoma* v. *Taxpayers,* 357 U. S. 320.

"PUD takes the position that Seattle is powerless to acquire PUD's lands by reason of a specific prohibition in Section 35.84.30 [.030] of the Revised Code of Washington (1951); that Seattle cannot qualify as an applicant for a license because of its inability to show compliance with the requirements of state law as required by Section 9(b) of the Federal Power Act; and that the Washington statute's restriction on Seattle's capacity to condemn PUD's properties is an impediment to Seattle's exercise of the right granted to a licensee by Congress in Section 21 of the Federal Power Act to acquire necessary properties by eminent domain in the federal courts. We need not decide in this proceeding whether Seattle is prohibited by state law from acquiring the particular properties of PUD in question. In our opinion Seattle's right to acquire these properties by the exercise of the power of eminent domain under Section 21 of the Federal Power Act is well established. *FPC* v. *Tuscarora Indian Nation,* 362 U. S. 99; *City of Tacoma* v. *Taxpayers, supra; First Iowa Hydro-Electric Cooperative* v. *FPC,* 328 U. S. 152; *State of Washington Department of Game* v. *FPC,* 207 F. (2d) 391, cert. den. 347

U. S. 936. And as we found in our order issuing license, Seattle has submitted satisfactory evidence of compliance with the requirements of all applicable state laws insofar as necessary to effect the purposes of the license."

It should be noted that the Commission did *not* decide whether or not the city was prohibited by RCW 35.84.030 from acquiring the P.U.D.'s properties by condemnation because, even if it were so prohibited, the city could exercise the power of eminent domain under § 21 of the Federal Power Act, which reads as follows:

"When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000." 16 U.S.C. § 814.

September 26, 1961—The P.U.D. filed a petition with the United States Court of Appeals for the District of Columbia to review and set aside the orders of the Federal Power Commission above referred to. In its petition for review, one of the grounds for relief is stated as follows:

"(6) The Commission erred in concluding that Seattle has complied with Section 9(b) of the Federal Power Act, 16 U.S.C. § 802(b), which requires an applicant to submit satisfactory evidence of compliance with the laws of the state within which the project is located with respect to bed and banks of the river. The Commission erroneously

concluded also that it need not decide whether the laws of Washington prohibit condemnation of the PUD's properties, on the basis of the case of *City of Tacoma* v. *Taxpayers*, 357 U. S. 320 and other cases it cited. The cases cited, for numerous reasons, are both non-controlling and inapplicable. Moreover, these cases related to state laws forbidding a dam in a navigable stream instead of a law prohibiting the use of the power of condemnation by municipal corporations, one against the other, which makes no reference to a river. The Commission erroneously concluded that, even though it be assumed Seattle is incapacitated by state law from condemning PUD's properties, nevertheless Seattle has a right to acquire these properties by exercising the power of eminent domain under Section 21 of the Federal Power Act, 16 U.S.C. § 814. The Commission erroneously concluded that *City of Tacoma* v. *Taxpayers*, 357 U. S. 320, and the other cases it cited, established that in the exercise of the eminent domain powers of Section 21 of the Federal Power Act, 16 U.S.C. § 814, Seattle could override the state's laws specifically limiting the intrastate relationship between a city and a public utility district. In these respects the Commission misinterpreted the Federal Power Act and its orders are in conflict with fundamental principles of law governing the division of authority under our Constitution between the state governments and the Federal Government. In addition, the Commission erred in failing and refusing to consider and to give proper weight, in the application of the Federal Power Act, to the policy expressed by the Washington statute which deprives Seattle of capacity to condemn PUD's properties."

The city's motion for permission to intervene was granted by the court of appeals. This cause (No. 16,653) was argued by both the P.U.D. and the city on May 7, 1962. As yet, no decision has been announced. Thus, the controversy is now resting in the bosom of the only court in the land that has competent jurisdiction to decide it. *Tacoma* v. *Taxpayers*, 357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209.

It was stated by counsel at the oral argument in this court that the court of appeals had been requested by the P.U.D. to withhold its decision pending the final decision of this court construing RCW 35.84.030 with respect to the power of the city to condemn the P.U.D.'s property. The

court of appeals has not indicated whether it will comply with this suggestion.

The case at bar was instituted on November 30, 1961, by a taxpayer and customer of the Seattle lighting department against the city for a declaratory judgment construing RCW 35.84.030. The P.U.D. was permitted to intervene in the trial court and contended that the statute should be construed as forbidding the city to condemn its property. Whether the original plaintiff had standing to maintain a declaratory judgment action under the circumstances described above, it is not necessary to decide.

We have before us the same two adversary litigants (the P.U.D. and the city) who vigorously argued the merits of the question of the city's power (or lack of power) to condemn the P.U.D.'s property both before the Federal Power Commission and the court of appeals. At that time, there was no decision of this court construing RCW 35.84.030, and, of course, there still is none. The F.P.C. ruled that there was no necessity to consider RCW 35.84.030 at all because the city had authority to condemn the P.U.D. property under § 21 of the Federal Power Act quoted above.

The question before us is whether the trial court erred in holding that it had no jurisdiction to decide the same dispute which had been submitted to, and (for the reason just mentioned) was *not* decided by, the Federal Power Commission (and was then pending before the court of appeals). The hearing before the trial court was held on January 8 and 9, 1962.

As appellants contend, there is no doubt that, as a general proposition, a municipality is a creature which owes its existence and its power to function to state statutes and that it has only the powers vested in it by the legislature.

Neither is there any doubt concerning appellants' further contention that the interpretation of a statute by the highest court of the state with respect to a particular state of facts is binding on all federal courts.

The determinative question is whether the Federal Power Commission has jurisdiction to issue a license when,

in compliance with § 9(b) of the Federal Power Act, it has made a finding that the applicant has complied with the requirements of the laws of the state with respect to the right to engage in the business of developing, transmitting, and distributing electric power, and any other business necessary to effect the purposes of the license.

Having made such finding, the F.P.C. has power to proceed as it did under the act, unless the court of appeals upon review decides otherwise.

As I view the problem, it was so held by the Supreme Court of the United States in 1946, when it decided the case of *First Iowa Hydro-Electric Coop. v. Federal Power Comm.*, 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906.

Even if the F.P.C. had passed on the applicability of RCW 35.84.030, the majority of the Supreme Court in the *First Iowa* case, *supra*, held that, under § 9(b) of the Federal Power Act, the Commission had jurisdiction to make a finding that the applicant had complied with all applicable state laws, even in the absence of state court decisions interpreting state statutes.

This is pointed up by the dissenting opinion of Mr. Justice Frankfurter, who differed with the majority on this one point. He said:

"We are all agreed that Congress has the constitutional power to promote a comprehensive development of the nation's water resources and that it has exercised its authority by the Federal Power Act. 41 Stat. 1063, 49 Stat. 838; 16 U.S.C. §§ 791(a) *et seq.* See *United States v. Chandler-Dunbar Co.*, 229 U. S. 53; *New Jersey v. Sargent*, 269 U. S. 328; *United States v. Appalachian Power Co.*, 311 U. S. 377. And in view of Congress' power, of course this enactment overrides all State legislation in conflict with it. But the national policy for water power development formulated by the Federal Power Act explicitly recognizes regard for certain interests of the States as part of that national policy. This does not imply that general, uncritical notions about so-called 'States' rights' are to be read into what Congress has written. It does mean that we must adhere to the express Congressional mandate that the public interest which underlies the Federal Power Act involves the protection of particular matters of intimate

concern to the people of the States in which proposed projects requiring the sanction of the Federal Power Commission are to be located. By § 9 (b) of the Act, 41 Stat. 1063, 1068; 16 U.S.C. § 802 (b), Congress explicitly required that before the Commission can issue a license for the construction of a hydro-electric development, such as the proposed project of the petitioner, the Commission must have 'satisfactory evidence that the applicant has complied with the requirements of the laws of the State' in reference to the matters enumerated.

"Whether the Commission has such 'satisfactory evidence' necessarily depends upon what the requirements of State law are. In turn, what the requirements of State law are often depends upon the appropriate but unsettled construction of State law. And so, the Commission may well be confronted, as it was in this case, with the necessity of determining what the State law requires before it can determine whether the applicant has satisfied it, and, therefore, whether the condition for exercising the Commission's power has been fulfilled.

"To safeguard the interests of the States thus protected by § 9 (b), Congress has directed that notice be given to the State when an application has been filed for a license, the granting of which may especially affect a State. § 4 (f), 49 Stat. 838, 841; 16 U.S.C. § 797 (f). If a State does not challenge the claim of an applicant, the evidence submitted by the applicant, if found to be satisfactory by the Commission, has met the demands of § 9 (b), and a State cannot thereafter challenge the Commission's determination. But a real problem in administration is presented to the Power Commission when a State does intervene and claims that the applicant has not complied with its lawful requirements. For, before the Commission can meet the duty placed on it by § 9 (b), it must ascertain the scope and meaning of the State law. Suppose the State law is not clear or is susceptible of different constructions and has received no construction by the only authoritative source for the interpretation of State laws, namely, the highest court of the State. Must the Federal Power Commission give an independent interpretation of the laws of the State? This is not to suggest an unreal or hypothetical situation. The Federal Power Commission submitted here a compilation of laws relating to State requirements relevant under § 9 (b) for not less than thirty States. Are the lawyers of the Commission to make themselves the originating interpreters of the laws of these States? Are they to construe, for in-

stance, the laws of New Jersey and Oklahoma and Arizona and Illinois when the courts of those States have not spoken? And if they do and the State appeals from the decision, must the Court of Appeals for the District of Columbia become the interpreter of these various laws? Finally, in the event of a further appellate review is this Court to construe State legislation without guidance by the State courts? Time out of mind, and in a variety of situations, this Court has admonished against the avoidable assumption by this Court of the independent construction of State legislation. See, *e.g.*, *Gilchrist v. Interborough Co.*, 279 U. S. 159, 207-209; Brandeis, J., dissenting, in *Railroad Comm'n v. Los Angeles R. Co.*, 280 U. S. 145, 158, 164-66. It is pertinent to recall the classic statement of the reason for leaving to the controlling interpretation of local courts the meaning of local law: 'to one brought up within it, varying emphasis, tacit assumptions, unwritten practices, a thousand influences gained only from life, may give to the different parts wholly new values that logic and grammar never could have got from the books.' *Diaz v. Gonzalez*, 261 U. S. 102, 106. If it has been deemed unwise to throw upon this Court the burden of construing local legislation when the construction could by appropriate procedure be had from the States, it seems odd that we should reject this as a rule of administration adopted by the Power Commission."

It is to be noted that the majority of the Supreme Court did not think that § 9 (b) required the Commission to wait until the state courts interpreted the meaning of state laws bearing on the question of the applicant's compliance therewith.

The majority opinion in the present case attempts to distinguish the three *Tacoma* cases cited in footnote 2 on the ground that the decision of the United States Supreme Court (357 U. S. 320, 2 L. Ed. (2d) 1345, 78 S. Ct. 1209) was based solely on the doctrine of res judicata regarding the decision of the court of appeals (207 F. (2d) 391). Generally speaking, that is true. But the Supreme Court actually went further and held that the Federal Power Commission's finding (No. 53), to the effect that the applicant (city of Tacoma) had submitted satisfactory evidence of compliance with all state laws insofar as necessary to effectuate the

purposes of the project, was, after being approved by the court of appeals (and *certiorari* denied by the Supreme Court), binding on the parties involved. See 357 U. S., pp. 334-337.

In this case, the Federal Power Commission decided that it was not necessary to pass on the meaning or validity of RCW 35.84.030 because the city had power, under § 21 of the Federal Power Act (above quoted), to condemn the necessary properties of the P.U.D. The jurisdiction of the court of appeals has been invoked to review that decision. As pointed out by the United States Supreme Court in the *Tacoma* case, *supra*, the court of appeals has *exclusive* jurisdiction to affirm, set aside, or modify, in whole or in part, orders of the Federal Power Commission. That court now has under consideration the question of the correctness and validity of the finding above quoted.

Until that court renders its decision or stays its hand pending the final decision of this court (if it so elects), no other court in the land, state or federal, has jurisdiction of the issue presented to the trial court in this case.

In the interest of brevity, reference is made to the concurring opinion in the most recent *Tacoma* case (*ante* p. 66) at page 73 *et seq.*, and the authorities cited therein. It is recognized that in that case Initiative No. 25 was not enacted until many years after the Federal Power Commission had issued, and the city of Tacoma had accepted, a license for the project, while in this case the statute claimed to be prohibitory had been on the books for over twenty-five years prior thereto. However, the question of jurisdiction is settled by the *First Iowa* case and the *Tacoma* case referred to above.

Because the F.P.C. did not find it necessary to decide the question urged upon us by appellants and for the further reason that the court of appeals has exclusive jurisdiction of the controversy, it is my opinion that the trial court correctly held that it had no jurisdiction of the controversy, and its judgment dismissing the action should be affirmed.

HAMILTON, J., concurs with DONWORTH, J.

FINLEY, C. J. (dissenting)—The logic or reasoning of the dissent written by Judge Donworth is *in my opinion* unanswerable and it follows that remanding this matter for further proceedings in the trial court is a fruitless act; consequently I concur in the dissent.

October 2, 1962. Petition for rehearing denied.