[No. 49186–1. En Banc. June 15, 1983.]

CHEMICAL BANK, *Respondent,* v. WASHINGTON PUBLIC POWER SUPPLY SYSTEM, *Respondent,* COLUMBIA RURAL ELECTRIC ASSOCIATION, INC., ET AL, *Petitioners.*

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *Richard S. White, David F. Jurca,* and *Linda J. Cochran,* for petitioner Columbia Rural Electric Ass'n.

*Stimson Bullitt, Gordon W. Wilcox,* and *John D. Lowery* (of *Riddell, Williams, Bullitt & Walkinshaw*), for 21 petitioners.

*Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern,* by *Albert R. Malanca, Kenneth G. Kieffer, Donald S. Cohen,* and *John C. Guadnola,* for petitioners Washington Public Utilities Group.

*Milne, Lemargie & Fitterer,* by *Robert Milne,* for Grant County PUD No. 2.

*Davis, Arneil, Dorsey, Kight & Parlette,* by *David J. Dorsey,* for Chelan County PUD No. 1.

*Williams, Novack & Hansen,* by *Jeffrey E. Pratt,* for Snohomish County PUD No. 1.

*George, Hull & Porter, P.S.,* by *John D. Reagh* and *Richard A. Pitt,* for petitioners Cities of Canby, Cascade

Locks, and Drain.

*Jones, Grey & Bayley, P.S.,* by *Hugo E. Oswald, Jr., Margaret E. Pageler,* and *Charles H. Thulin,* for petitioner City of Ellensburg.

*Detels, Draper, Madden & McGee,* by *Martin P. Detels* and *Bonita L. Olson; Rankin, McMurry, VavRosky & Doherty,* by *Garry P. McMurry;* and *Haugeberg & Rueter,* by *David Haugeberg,* for petitioners Cities of McMinnville and Springfield.

*Smith & Rosellini,* by *Jacob L. Smith,* for petitioner City of Sumas.

*Lane, Powell, Moss & Miller, John R. Tomlinson, Larry S. Gangnes,* and *H. Peter Sorg, Jr. (Schwabe, Williamson, Wyatt, Moore & Roberts, Rockne Gill, J. Laurence Cable, Donald A. Haagensen,* and *Bernard Ryan; Heisler & Heisler* and *Stanley D. Heisler;* and *George P. Winslow, Jr.,* of counsel), for petitioners Oregon PUD's.

*Frome & Goulding* and *Ted C. Frome,* for petitioner Lower Valley Power and Light, Inc.

*Velikanje, Moore & Shore, Inc., P.S.,* by *Scott L. Schmidtman,* for petitioners Borgens, et al.

*William H. Rodgers, Jr., Peter J. Eglick,* and *Michael W. Gendler,* for petitioners Clark County PUD Owners' Ass'n, et al.

*Betts, Patterson & Mines, P.S.,* by *Michael Mines (Cravath, Swaine & Moore,* of counsel), for respondent Chemical Bank.

*Culp, Dwyer, Guterson & Grader, Richard C. Yarmuth, Michele Coad, Earle J. Hereford, Jr., Edwards & Barbieri,* and *Malcolm L. Edwards,* for respondent Washington Public Power Supply System.

*Roberts & Shefelman, George M. Mack,* and *Joni H. Ostergaard (James M. Taylor, City Attorney,* of counsel), for respondent City of Richland.

*Forrest W. Walls, Douglas H. Rosenberg,* and *William M. Doyle* on behalf of Washington Public Ports Association, amici curiae for respondents.

BRACHTENBACH, J.—The Washington Public Power Supply System (WPPSS) issued revenue bonds to obtain funds to construct two nuclear generating plants known as WNP–4 and WNP–5. Bonds in the face amount of approximately $2.25 billion have been issued; repayment with interest will cost approximately $7.2 billion. Chemical Bank is the trustee for the bondholders.

Construction of the two plants was undertaken. On January 22, 1982, WPPSS terminated construction of both plants. At that time WNP–4 was approximately 24 percent completed and WNP–5 approximately 16 percent completed. Costs to date had almost reached the original estimated total cost for complete construction of both plants. WPPSS alleges that termination was necessary due to its inability to obtain adequate financing to complete the projects.

Chemical Bank brought a declaratory judgment action against WPPSS and the participants (defined hereafter) seeking a determination that the participants owe to WPPSS sufficient funds to pay the bonds, with interest. In general WPPSS has responded to the suit by substantially agreeing with Chemical Bank as to the rights and obligations of the various parties. Most of the participants, however, have interposed numerous defenses to any payment obligation.

The pleadings framed numerous issues, some of which have been determined by the trial court on motions for partial summary judgment. We granted discretionary review on limited issues on which the trial court granted summary judgment in favor of the bond trustee and stayed further trial on other issues until this appeal was decided. On some of those issues we reverse.

To understand the complex issues, a recital of facts is necessary. WPPSS is a "joint operating agency" established

in 1957 under RCW 43.52. It is a municipal corporation. RCW 43.52.250. Its members are 19 public utility districts and four cities, Ellensburg, Richland, Seattle and Tacoma. It has authority to acquire, build, operate and own power plants and systems for the generation and transmission of electricity. RCW 43.52.300. WPPSS also has authority to issue revenue bonds payable from the revenues of the utility properties operated by it. RCW 43.52.3411. It may not levy taxes or issue general obligation bonds. RCW 43.52-.391.

In the early 1970's WPPSS started construction of three nuclear generating projects, WNP–1, WNP–2 and WNP–3. Those projects were developed in conjunction with a number of participating public utilities from several northwestern states, including Washington. In 1974 WPPSS decided to construct two additional plants, WNP–4 and WNP–5, financing of which is the subject of this litigation. WNP–4 is owned entirely by WPPSS; WNP–5 is owned 90 percent by WPPSS and 10 percent by Pacific Power and Light Company, a privately owned utility.

Besides WPPSS and Pacific Power and Light Company, there are 88 "Participants" in these two projects: 9 Washington cities, 19 Washington public utility districts, 1 Washington irrigation district, 7 Oregon cities, 4 Oregon peoples utility districts, 5 Idaho cities, and 43 rural electric cooperatives, of which 13 are in Washington. The remainder of the rural electric cooperatives are in Idaho, Montana, Nevada, Oregon and Wyoming. Each of the participants in WNP–4 and WNP–5 signed an identical 63–page "Participants' Agreement", dated July 14, 1976.

A 117–page "Bond Resolution" was adopted by WPPSS on February 23, 1977, providing a plan for the construction of both plants and providing for the issuance of revenue bonds.

Each Participants' Agreement provided that "Supply System hereby sells, and the Participant hereby purchases, its Participant's Share of Project Capability."

"Project Capability" is defined in section 1(v) of the

agreement as:

the amounts of electric power and energy, if any, which the Projects are capable of generating at any particular time (including times when either or both of the Plants are not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or curtailed, in each case in whole or in part for any reason whatsoever), less Project station use and losses.

The Participants' Agreement requires each participant to pay monthly its proportionate share of a "Billing Statement" issued annually by WPPSS and based upon an "Annual Budget." The "Annual Budget" is to be adopted by WPPSS commencing with the "Date of Continuous Operation" (defined in effect as when the plant is ready to be operated and the output scheduled on a commercial basis) *or* the date 1 year after the termination of a project. The Bond Resolution in turn similarly requires WPPSS to collect and set aside funds sufficient to make payments on the bonds. Termination thus established a trigger date for various payments, and gave rise to this lawsuit.

The Participants' Agreement purports to require payment to WPPSS whether or not the projects are ever completed, operable or operating. Specifically, section 6(d) provides:

The Participant shall make the payments to be made to Supply System under this Agreement whether or not any of the Projects are completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of either Project for any reason whatsoever in whole or in part. Such payments shall not be subject to any reduction, whether by offset or otherwise, and shall not be conditioned upon the performance or nonperformance by Supply System or any other Participant or entity under this or any other agreement or instrument, the remedy for any nonperformance being limited to mandamus, specific performance or other legal or equitable remedy.

The Bond Resolution requires WPPSS to collect charges for electricity and capability, which are adequate to provide for payment of the revenue bonds "whether or not the gen-

eration or transmission of power . . . is suspended, interrupted or reduced for any reason whatever . . ."

Thus, if the agreements are valid, and subject to interpreting the contract, the participants collectively could pay approximately $7 billion for nuclear plants which will never generate any electricity. Ultimately the ratepaying consumers of the participants would pay for the nonexistent electricity.

The method of financing WNP–1, 2 and 3 differs from that involved in WNP–4 and 5. The Bonneville Power Administration, a federal agency, facilitated financing of the first three plants through complex "net–billing" agreements that allocated the risk of noncompletion to the federal agency. *Springfield v. Washington Pub. Power Supply Sys.*, No. 82–1387–RE, slip op. at 12–13 (D. Or. April 27, 1983). Since Judge Redden concluded that net billing only requires the participants to pay for power as it is provided, *Springfield* at 12, those projects apparently may be characterized as contracts for the purchase of power. We need not analyze this device, but note that it resulted in an indirect guaranty by Bonneville Power Administration, combined the costs of nuclear power plant construction with less costly hydropower and resulted in lower interest rates on the bonds.

The rates charged by WPPSS or public utility districts are not subject to the ratemaking supervision of the State Utilities and Transportation Commission. RCW 43.52.450; RCW 54.16.040.

As noted above, various participants interposed numerous defenses to the Chemical Bank action and cross claims against WPPSS. Among those defenses were (1) allegations that at least some participants did not have authority to enter into the agreement; and (2) that proper interpretation of the agreement did not require payment as sought by WPPSS and the bond trustee. Demand for a jury was made.

After hearing extensive oral argument and considering voluminous briefs and affidavits (the record is nearly 7,000

pages) the trial court entered an order on summary judgment motions on November 16, 1982, which provided *inter alia*:

1. As a matter of law, the language of the Participants' Agreement provides that the participants are obligated to pay WPPSS their respective shares of the debt service which WPPSS is obligated to pay on the bonds issued pursuant to WPPSS Board of Directors Resolution No. 890 (the "Bond Resolution") and the resolutions supplemental thereto. Such debt service on the bonds includes all principal and interest when due, whether or not any of the projects (WPPSS Nuclear Plants Nos. 4 and 5) has been or ever will be completed or placed into operation.

2. As a matter of law, the language of the Participants' Agreement provides that the participants are obligated to pay WPPSS their respective shares of decommissioning costs incurred by WPPSS, whether or not any of the projects has been or ever will be completed or placed into operation. Under the terms of the Participants' Agreement, such decommissioning costs (a) are not limited to costs incurred after termination of the projects and (b) are to be included in the Annual Budgets or amended Annual Budgets and are to be paid by the participants pursuant to the annual or amended Billing Statements.

3. As a matter of law, WPPSS had statutory authority to enter into the Participants' Agreement and Bond Resolution and to issue the bonds pursuant thereto.

4. As a matter of law, the Washington participants (other than Vera) had statutory authority to enter into the Participants' Agreement. All Oregon authority issues have been stayed pursuant to an earlier order of this court, and this order has no bearing on the authority of Oregon participants to enter into the Participants' Agreement. The court reserves decision as to whether Vera and the other participants had authority to enter into the Participants' Agreement and will give further consideration to that issue at a later date.

5. As a matter of law, any obligations of the Washington participants under the Participants' Agreement do not violate Washington constitutional or statutory limitations on the incurring of debt. Such obligations do not constitute debt within the meaning of such limitations, and even if such limitations were otherwise applicable they would be rendered inapplicable by reason of the

special fund doctrine under Washington law.

6. As a matter of law, any obligations of the Washington participants under the Participants' Agreement do not violate Washington constitutional or statutory limitations on the lending of credit.

7. As a matter of law, the Participants' Agreement does not constitute or provide for any unlawful delegations of power or authority by Washington participants.

8. The Interstate Compact Clause of the United States Constitution is not applicable to the Participants' Agreement.

. . .

10. The aforesaid crossmotions for summary judgment or partial summary judgment filed by Ellensburg, Springfield and McMinnville, the "Columbia defendants" and the "22 defendants" are denied.

Clerk's Papers, at 120–22.

Later the court struck the jury demand. We granted review of the authority and interpretation issues as well as the striking of the jury.[1]

We are asked to decide whether the Participants' Agreement and the Bond Resolution, hereinafter referred to as the agreement, were contracts within the statutory authority of the Washington participants.[2] While the participants are not direct parties to the Bond Resolution, the Participants' Agreement, § 25, provides that WPPSS must comply

---

[1]This opinion is limited to the statutory authority questions and we do not address the other issues presented by the parties: the right to a jury; WPPSS' authority; municipal debt limitations; or contract interpretation.

[2]This issue is limited to the authority of the Washington PUD's and municipalities, hereinafter referred to collectively as the participants. The authority of most of the rural electrical cooperatives (including those in Washington) and the Vera Irrigation District were the subject of separate trial court orders and are not before this court. The authority of the Idaho, Oregon, Wyoming and Nevada participants is currently being litigated in their respective states.

An Oregon trial court has held that Oregon cities and PUD's lacked authority and the agreement was contrary to public policy. Defazio v. Springfield Utility Board, cause 16–81–11344 (Lane County Cir. Ct. Nov. 5, 1982). That case is on appeal. The Idaho Supreme Court has entered an order prohibiting collection of funds until the matter is decided on the merits. Asson v. City of Burley, cause 82–174 (Sup. Ct. Nov. 3, 1982). The Wyoming Rate Commission has ruled that rates may not be increased to pay the WPPSS debt.

with the Bond Resolution and the Participants' Agreement is subject to the terms of the Bond Resolution.

■ Initially, some principles of statutory construction are relevant to the court's analysis. "Language within a statute must be read in context with the entire statute and construed in a manner consistent with the general purposes of the statute." *Nationwide Papers, Inc. v. Northwest Egg Sales, Inc.,* 69 Wn.2d 72, 76, 416 P.2d 687 (1966). Similarly, "[s]tatutes pertaining to the same subject matter must be harmonized, if possible." *Snohomish Cy. PUD 1 v. Broadview Television Co.,* 91 Wn.2d 3, 8, 586 P.2d 851 (1978). The resolution of the authority issue requires an examination of the entire statutory scheme governing each category of participant to determine whether they had the express power to enter into this agreement. Absent express statutory authorization, we must also consider whether participation in the agreement may be based upon necessary or implied powers. Aided by applicable rules of statutory construction and prior cases construing the various statutory powers, we ultimately must decide whether the present agreement conforms to the statutes. Our conclusion in this case is therefore based upon an examination of all Washington statutes authorizing the purchase of electricity, the acquisition or construction of generating facilities, joint operating agencies, and joint development of energy generating projects.

I

PURCHASE OF ELECTRICITY

The Washington participants have explicit statutory authority to buy electricity on behalf of citizens. For example, each of the 19 Washington public utility districts involved in this litigation is authorized to: "purchase, within or without its limits, electric current for sale and distribution within or without its limits . . ." RCW 54.16-.040.

Similarly, the nine Washington municipal participants could purchase electricity, although the grants of authority varied according to the class of city or town. The first class

cities of Tacoma and Richland were authorized to: "provide for lighting the streets and all public places, and for furnishing the inhabitants thereof with gas or other lights . . ." RCW 35.22.280(15). Centralia, the only participant exercising second class city powers,[3] had the authority to: "provide for lighting the streets and all public places of the city and for furnishing the inhabitants of the city with gas, electric, or other light . . ." RCW 35.23.440(44). As third class cities, Blaine and Ellensburg had the power to: "establish, lay out, alter, keep open, open, widen, vacate, improve and repair streets, sidewalks, alleys, squares and other public highways and places within the city, and to drain, sprinkle and light the same . . ." RCW 35.24.290(3). In practically identical language, towns such as McCleary and Steilacoom were authorized to secure electricity. RCW 35.27.370(4). The final category of municipal participants, code cities, includes Port Angeles and Sumas. A code city may: "provide utility service within and without its limits and exercise all powers to the extent authorized by general law for any class of city or town." RCW 35A.80.010.

In addition to these categorical grants of enumerated powers, the PUD's and cities[4] were authorized, under the statutory provisions that created WPPSS, to: "enter into contracts or compacts with any operating agency or a publicly or privately owned public utility for the purchase and sale of electric energy or falling waters." RCW 43.52.410. Thus, the various statutes clearly provide for Washington PUD's, cities and towns to purchase and sell electricity.

▮ Initially, we must decide whether this agreement is authorized as a purchase of electricity by the participants. As discussed in greater detail, *infra*, the purchase of

---

[3]Although not of sufficient size to qualify as a second class city, Centralia under the commission form of government exercised all the powers of a second class city. RCW 35.17.030.

[4]City is defined in RCW 43.52 as: "'City' means any city or town in the state of Washington authorized to engage in the business of generating and/or distributing electricity." RCW 43.52.250.

"project capability" under this agreement is essentially an unconditional guaranty of payments on the revenue bonds, secured by a pledge of the participants' utility revenues, in exchange for a share of any power generated by these projects. The agreement expressly provides for the possibility that no electricity will be generated and that participant payments will be due even if the project is not completed. The unconditional obligation to pay for no electricity is hardly the purchase of electricity. We hold that an agreement to purchase project capability does not qualify as a purchase of electricity.

## II

### ACQUISITION OF ELECTRIC GENERATING FACILITIES

Another type of express authority granted to cities and towns is the power to construct, acquire and operate electric generating facilities. RCW 35.92.050. That statute provides:

> A city or town may also construct, condemn and purchase, purchase, acquire, add to, maintain and operate works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting, heating, fuel, and power purposes, public and private, with full authority to regulate and control the use, distribution, and price thereof, together with the right to handle and sell or lease, any meters, lamps, motors, transformers, and equipment or accessories of any kind, necessary and convenient for the use, distribution, and sale thereof; authorize the construction of such plant or plants by others for the same purpose, and purchase gas, electricity, or power from either within or without the city or town for its own use and for the purpose of selling to its inhabitants and to other persons doing business within the city or town and regulate and control the use and price thereof.

RCW 35.92.050. Under this provision the municipalities clearly had the authority to build or buy their own plants. *Jones v. Centralia*, 157 Wash. 194, 289 P. 3 (1930). In almost identical language, the PUD's are granted the express authority to construct, acquire and operate electric

generating facilities. RCW 54.16.040. The respective powers of the PUD's and cities are similar and therefore subject to a similar construction. *State ex rel. PUD 1 v. Wylie,* 28 Wn.2d 113, 127–30, 182 P.2d 706 (1947). Under the provisions, the participants clearly could construct, acquire and operate generating facilities.

In construing these provisions, however, this court has never found authority for a project in which the participants did not have an ownership interest. *E.g., Roehl v. PUD 1,* 43 Wn.2d 214, 261 P.2d 92 (1953); *State ex rel. PUD 1 v. Schwab,* 40 Wn.2d 814, 246 P.2d 1081 (1952). Under this agreement, section 1.1(o) of the Bond Resolution expressly provides that only WPPSS and Pacific Power and Light Company retain any ownership interest in the projects. In comparison, the participants do not retain an ownership share in this project but only contracted to buy from WPPSS a share of project capability. Section 1(v) of the Participants' Agreement defines "project capability" as:

> "Project capability" means the amounts of electric power and energy, if any, which the Projects are capable of generating at any particular time (including times when either or both of the Plants are not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or curtailed, in each case in whole or in part for any reason whatsoever), less Project station use and losses.

The "electric power and energy, if any" language indicates that the parties anticipated a possible share of no power. This impression is reinforced by section 6(d) of the Participants' Agreement which purportedly mandates payment by the participants irrespective of project completion. This so–called "dry hole" provision states:

> The Participant shall make the payments to be made to the Supply System under this Agreement whether or not any of the Projects are completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of either Project for any reason whatsoever in whole or in

part. Such payments shall not be subject to any reduction, whether by offset or otherwise, and shall not be conditioned upon the performance or nonperformance by Supply System or any other Participant or entity under this or any other agreement or instrument, the remedy for any nonperformance being limited to mandamus, specific performance or other legal or equitable remedy.

In effect, the participants unconditionally guaranteed WPPSS bonds with no guaranty of electricity in return.

Some states have provided statutory authority for such unconditional guaranties and courts have recognized the validity of projects developed under those provisions. *Johnson v. Piedmont Mun. Power Agency,* 277 S.C. 345, 287 S.E.2d 476 (1982). That recognition, however, is based upon very explicit statutory authority. South Carolina's "Joint Municipal Electric Power and Energy Act" provides an example:

Any municipality which is a member of the joint agency may contract to buy from the joint agency power and energy required for its present or future requirements, including the capacity and output of one or more specified projects. As the creation of a joint agency is an alternative method whereby a municipality may obtain the benefits and assume the responsibilities of ownership in a project, *any such contract may provide that the municipality so contracting shall be obligated to make the payments required by the contract whether or not a project is completed, operable or operating notwithstanding the suspension, interruption, interference, reduction or curtailment of the output of a project or the power and energy contracted for,* and that such payments under the contract shall not be subject to any reduction, whether by offset or otherwise, and shall not be conditioned upon the performance or nonperformance of the joint agency or any other member of the joint agency under the contract or any other instrument.

(Italics ours.) S.C. Code Ann. § 6–23–110 (Law. Co–op. Supp. 1982). Several other states have similar statutes. Mass. Ann. Laws, ch. 164A, § 3(b) (Law. Co–op. 1979); Me. Rev. Stat. Ann., tit. 35, § 4103(1)(B) (Supp. 1982); N.C. Gen. Stat. § 159B–12 (1982); Va. Code § 15.1–1611 (1981);

Vt. Stat. Ann., tit. 30, § 604 (Supp. 1982). This state has no such statute.

Nonetheless, rather than ruling that an ownership interest is an absolute requirement when acquiring or constructing generating facilities, we will examine the present agreement to determine whether the participants retained sufficient control over the project to constitute the equivalent of an ownership interest. In the present case, several provisions of the agreement limit the participants' role in management to an extent inconsistent with control of any facilities acquired or constructed. For example, section 15 of the Participants' Agreement requires the establishment of a "participants' committee" to meet periodically and to approve or disapprove major decisions relating to the management of projects. Items that are explicitly set out in the agreement to be referred to the committee include: construction budgets, contracts involving more than $2 million and proposed bond resolutions. The inclusion of such items suggests a degree of control and involvement in management, yet section 15 also sets out a procedure for committee consideration of WPPSS proposals that precludes meaningful deliberation on the part of the committee. With limited exceptions, that procedure requires that 20 percent of the participants register their *disapproval* of any WPPSS proposal within 15 days or that proposal "shall be deemed approved." Considering the complexity of the various budgetary items, construction decisions and financing arrangements involved in a project of this scope, it seems unlikely that a part–time committee of representative participants could provide significant input to the management of the projects with such rigid procedural requirements. It appears to this court that such limited involvement in project management does not satisfy the type of ownership control envisioned in the statutes.

It should be noted that we recognize the necessity and propriety of establishing representative committees to manage and oversee joint development projects. *E.g., Roehl v. PUD 1*, 43 Wn.2d 214, 261 P.2d 92 (1953); *PUD 1 v.*

*Taxpayers of Snohomish Cy.,* 78 Wn.2d 724, 479 P.2d 61 (1971). Our concern is not with the use of such committees in general; it is with the structuring of such committee procedures in a way that does not allow sufficient participant involvement in project management to control their risk. Thus, although this court recognizes the need for delegating duties in the context of joint development agreements, *e.g., Roehl,* at 238–40; *Snohomish Cy.,* at 731, we are not prepared to sanction a virtual abdication of all management functions and policy decisions to an operating agency such as WPPSS. Here, the participants' committee apparently served as a rubber stamp for WPPSS' decisions, resulting in two terminated projects, less than 25 percent complete, at a cost of $2.25 billion, or almost $7 billion over the 30–year repayment period. As a matter of public policy, the enormous risk to ratepayers must be balanced by either the benefit of ownership or substantial management control.

Also, there is language common to each set of statutes indicating the Legislature intended that cities and PUD's should retain significant control over the use of any facilities acquired. For example, the statutes provide that the cities and PUD's have: "full and exclusive authority to sell and regulate and control the use, distribution, rates, service, charges, and price thereof . . ." RCW 54.16.040; RCW 35.92.050. While the public entities had the statutory authority to construct or acquire electric generating facilities, that authority is conditioned upon either an ownership interest or their active participation in the management of these facilities. Here, the municipal and PUD participants were not acquiring or constructing generating facilities as set out in the statutes because under the agreement they ceded virtually all of their ownership interests and most of the management responsibilities to WPPSS.

The need for a municipality or PUD to retain ownership and control over public construction projects is also evident from earlier decisions in which this court considered the PUD's authority to acquire or construct electric generating facilities as the basis for proposed power projects. In 1947

we analyzed the authority of Skagit County PUD to acquire the electricity production and distribution properties of Puget Sound Power and Light Company, an integrated electric generating system. *State ex rel. PUD 1 v. Wylie,* 28 Wn.2d 113, 182 P.2d 706 (1947). The Skagit County PUD argued that its authority to "purchase, within or without its limits, electric current for sale and distribution within or without its limits", Rem. Rev. Stat. § 11610(d) (Supp. 1945) (now codified as RCW 54.16.040), included the power to buy Puget Power properties. This court carefully reviewed all of the PUD statutes and concluded that the primary purpose of the public utility districts is to furnish electricity to the district and its inhabitants. *Wylie,* at 126. Therefore, the court concluded the PUD was not authorized to purchase facilities covering 18 counties, when the district needed only 5 percent of that generating capacity. As we stated, such a project would be "unreasonably large and entirely inappropriate for the accomplishment of the primary purpose of the Skagit district." *Wylie,* at 152; *accord, Jones v. Centralia,* 157 Wash. 194, 289 P. 3 (1930) (city's power projects held to same standard of unreasonably large or entirely inappropriate). Since this case does not involve a specific challenge to the scale of this project, it is the court's reasoning rather than the result that is relevant. In particular:

[t]here is nothing . . . which indicates that the act was intended to give public utility districts the power to engage in business beyond their limits on the grandiose scale here contemplated, and there are numerous provisions that are inconsistent with any such idea.

*Wylie,* at 147. The court's analysis established that even the express power to buy and sell electricity or to acquire or construct generating facilities may not be exercised in a manner beyond the scope of that primary purpose or such a project would be ultra vires.

These same statutory provisions were analyzed several years later in a case involving the Pend Oreille PUD's decision to build hydroelectric facilities in its own district.

*State ex rel. PUD 1 v. Schwab,* 40 Wn.2d 814, 246 P.2d 1081 (1952). Although the proposed project was massive and would have provided a supply of power well beyond the district's needs, this court concluded that the project was within the PUD's statutory authority. The court once again examined the entire PUD statutory scheme, but concluded that the primary purpose of providing power for the district included the duty to secure future power needs, even though at that time the district could use only 10 to 12 percent of the project capacity. *Schwab,* at 824–25. Respondents in this case argue that the same principle, providing future district energy needs, applies here and provides sufficient authority for participants to enter into the instant agreement. The extension of that principle is not that simple, however, because in *Schwab* the district retained all ownership interest in the facilities as well as management and control of the project. Here, those same elements of ownership and management are not present and the participants' risks were not subject to their control.

The year after *Schwab* was decided, this court considered a case involving joint development of a generating project and some of the problems of joint management of a project. *Roehl v. PUD 1,* 43 Wn.2d 214, 261 P.2d 92 (1953). In *Roehl,* five PUD's attempted to acquire the electric utility properties of Puget Sound Power and Light Company. Such a joint effort was authorized under a 1949 amendment to the PUD statutes, Laws of 1949, ch. 227, § 2 (now codified as RCW 54.16.200). Appellants alleged that the system was unreasonably large under *Wylie* and therefore exceeded the PUD's statutory authority. This court, however, held that the new joint acquisition statute allowed two or more districts to acquire integrated electric facilities beyond district lines. *Roehl,* at 237. Unlike the provisions governing single districts at issue in *Wylie* and *Schwab,* the new statute did not carry the implication that acquired facilities must be located within or necessary to serve the customers of the purchasing district. *Roehl,* at 237. The court also addressed the issue of PUD control over the

project, concluding that the executive board, consisting of one member from each utility, was responsible for overall project management and policy decisions, while the consulting engineer only performed administrative tasks relating to project operation. *Roehl,* at 240–41. That same degree of participant control is not present in this case because most of the policy decisions and management control are delegated to WPPSS, the operating agency, rather than any executive committee.

Applying the language of the acquisition or construction statutes and the principles derived from the cases construing that language, we do not believe the participants retained sufficient ownership interests or management responsibilities under this agreement to constitute acquisition or construction of an electric generating facility.

## III
### IMPLIED POWERS

On separate grounds, respondents urge, and the trial court ruled, that the express authority to acquire or construct generating facilities and provide electricity carries with it an implied power to pay for that service. *Municipality of Metro Seattle v. Seattle,* 57 Wn.2d 446, 459–60, 357 P.2d 863 (1960). In *Metro* this court upheld the City of Seattle's power to pledge city revenues to a countywide agency in order to pay for sewage disposal service. Since the statutes authorized the cities to provide sewage services and systems, we held: "[i]t must follow that with the power to provide a sewer system there is implied the power to pay for it, unless otherwise prohibited by the charter or statute." *Metro,* at 460. In the present case, the trial court extended this reasoning and concluded that the implied power to pay also included the power to make financing arrangements such as the present agreement. We disagree.

The services the city contracted for in *Metro* were to be paid as the services were provided, *Metro,* at 458–59, which is significantly different from the type of unconditional pledge of revenues contained in this agreement. Also,

the countywide agency agreed to process and dispose of the sewage in part through the use of the city's existing sewage treatment plants. *Metro,* at 449. Since the city continued to own the sewage treatment facilities, the revenues pledged were actually paid back to the city for the use of its facilities and these funds helped pay for those plants. That arrangement is distinguishable from the present agreement because here the pledges of revenues are not conditioned upon the receipt of services and in *Metro* the city owned the facility used to provide the services.

This court subsequently adopted a more stringent test for a municipality seeking to incur indebtedness based upon general grants of authority to provide services. In *Edwards v. Renton,* 67 Wn.2d 598, 602, 409 P.2d 153 (1965), we held that the power to borrow money: "should not and will not be inferred or implied from a general statutory authority permitting municipalities to enter into contracts or to incur indebtedness." Moreover, a municipal corporation's powers are limited to those conferred in express terms or those necessarily implied. *In re Seattle,* 96 Wn.2d 616, 629, 638 P.2d 549 (1981). If there is any doubt about a claimed grant of power it must be denied. *Port of Seattle v. State Utils. & Transp. Comm'n,* 92 Wn.2d 789, 794–95, 597 P.2d 383 (1979). The test for necessary or implied municipal powers is legal necessity rather than practical necessity. *Hillis Homes, Inc. v. Snohomish Cy.,* 97 Wn.2d 804, 808, 650 P.2d 193 (1982). As we stated in *Hillis*: "[i]f the Legislature has not authorized the action in question, it is invalid no matter how necessary it might be."

The parties argue that first class cities have greater powers than other municipalities, which precludes a narrow statutory construction. Generally, first class cities may exercise powers that do not violate a constitutional provision, legislative enactment, or the city's own charter. *Winkenwerder v. Yakima,* 52 Wn.2d 617, 622–23, 328 P.2d 873 (1958). These broad powers are derived from first class cities' status as "home rule" municipalities, *i.e.,* cities that frame their own charters and consequently retain broad

control over local matters. Const. art. 11, § 10. In some states, the home rule powers of municipalities result in considerable autonomy from state control. *E.g., Board of Cy. Comm'rs v. Thornton,* 629 P.2d 605, 609–10 (Colo. 1981). In Washington, the courts have interpreted the home rule powers of first class cities more narrowly. Professor Trautman perceptively characterized these limitations:

> The conclusion to be drawn is that in Washington a home rule city is subordinate to the legislature as to any matter upon which the legislature has acted, whether it be regarded as of state, local, or joint concern. In the event of an inconsistency, the statute prevails. However, in those instances in which the legislature has said nothing, an analysis of interests is vital. If the subject is of paramount state concern, some delegation of power by the legislature, express or implied, to the municipal corporation must be found. This is likewise true in those instances in which there is a joint state–local problem. Since the state will be affected by any action of the municipal corporation, it is necessary that an authorization to act from the legislature be found. In those instances in which the matter is solely of local interest, however, home rule cities may act without a delegation from the legislature, express or implied.

Trautman, *Legislative Control of Municipal Corporations in Washington,* 38 Wash. L. Rev. 743, 772 (1963). This court has applied that reasoning: "[t]herefore, at least when the interest of the State is paramount to or joint with that of the municipal corporation, the municipal corporation has no power to act absent a delegation from the legislature." *Massie v. Brown,* 84 Wn.2d 490, 492, 527 P.2d 476 (1974). Thus, the question is whether the State has acted in a manner inconsistent with the powers asserted here; or, the State has not acted, but has either a paramount interest or a joint interest with local municipalities.

The development of generating facilities through the joint efforts of municipalities and other public bodies is a subject of at least joint state and local interest. As reflected in both legislative enactments, *e.g.,* RCW 54.44, and decisions of this court, *e.g., Shorts v. Seattle,* 95 Wash. 538, 164

P. 241 (1917), the State is vitally interested in the diverse municipal powers that might be employed in this type of project. Because of the obvious state interest, either an express or implied delegation of power is necessary to find sufficient authority.

The holding in *Hillis* vitiates the arguments that this type of bond guaranty was a necessity to sell the bonds in the investment market. That may well be true, but necessity does not provide authority. Accordingly, we do not believe that this agreement is authorized as an implied power to pay for an admittedly proper municipal service.

## IV
### JOINT OPERATING AGREEMENTS

■ Another possible independent source of express power is the joint operating statutes under which WPPSS was created. RCW 43.52. As quoted previously, these provisions clearly authorize the participants to purchase "electric energy." RCW 43.52.410. By comparison, a joint operating agency is authorized to contract with any municipal corporation or public utility "for any term relating to the purchase, sale, interchange or wheeling of power". RCW 43.52.391. This difference in language indicates a critical distinction between the grants of authority to the participants and to WPPSS, because the city's and PUD's authority is significantly more limited. If WPPSS were simply selling the electric energy, the participants obviously would be authorized to buy it. However, since the terms of the agreement encompass only a potential share of any electricity that might be generated, it is not accurate to analyze the participants' authority in terms of purchasing electric energy. Since the statutes do not provide for the purchase of electric energy that may not be generated, we can discern no basis for the participants' authority in RCW 43.52.

## V
### JOINT DEVELOPMENT AGREEMENTS

A final category of express authority that could be

involved in this type project, but was not employed in the present case,[5] is contained in: "Nuclear, Thermal, Electric Generating Power Facilities—Joint Development", RCW 54.44. Under this statute, public entities explicitly are authorized to enter into agreements for the joint development of nuclear, thermal, or electric generating facilities. *See, e.g., PUD 1 v. Taxpayers of Snohomish Cy.*, 78 Wn.2d 724, 479 P.2d 61 (1971). Although there is no indication in the record as to why this chapter was not used, there are statutory requirements under RCW 54.44 notably absent from this agreement. For example, as joint developers the participants would have an ownership interest in any facility built. RCW 54.44.020. By comparison, the participants' only ownership interest under the present agreement is the right to share in the distribution of any excess assets at the termination of the project as set out in section 13(a)(iii) of the Participants' Agreement. The participants do retain a share of project capability in an amount equal to their percentage share in the project but, as explained above, that share might amount to nothing, as it in fact does here. Also, no share could be sold without approval of 80 percent of the other participants. Moreover, even if they obtained consent to sell, a participant, according to the agreement, would remain liable for its obligation despite any assignment to another party.

A second statutory requirement under RCW 54.44 is that each participant is responsible only for its own debts and obligation in the facility. RCW 54.44.030. In contrast, section 17(c) of the Participants' Agreement explicitly requires that participants assume the obligations of defaulting participants. If any municipal participant defaults, the remaining municipal participants' share is automatically increased pro rata. Thus, a participant would expressly

---

[5]Actually, WPPSS contracted under RCW 54.44 with Pacific Power and Light Company to give that private company a 10 percent ownership share of plant 5. The contracts with the remaining participants do not, however, involve that statute.

assume the debt of any defaulting participant. Since the record indicates that from the outset of the projects there were questions about the statutory authority of some 16 participants, it seems likely that the municipalities and PUD's would incur a greater obligation than they initially contracted for. Such an assumption of liability is expressly forbidden under the joint development provisions of RCW 54.44.030. In contrast, the South Carolina statute provides an example of express authority for such obligations:

> Any contract with respect to the sale or purchase of capacity or output of a project entered into between a joint agency and its member municipalities may also provide that if one or more of such municipalities shall default in the payment of its or their obligations with respect to the purchase of said capacity or output, then in that event the remaining member municipalities which are purchasing capacity and output under the contract shall be required to accept and pay for and shall be entitled proportionately to and may use or otherwise dispose of the capacity or output which was to be purchased by the defaulting municipality.

S.C. Code Ann. § 6–23–110 (Law. Co–op. Supp. 1982). Again, we have no such statute in this state.

Although other state courts have upheld such step–up provisions despite the lack of express statutory authority, *e.g., Frank v. Cody*, 572 P.2d 1106, 1111–12 (Wyo. 1977), we are not persuaded that a similar conclusion is appropriate here. In *Cody* the court found the participants retained an ownership interest in the joint project and a significant role in managing the project. *Cody*, at 1111. Moreover, default may have been less likely since payments were only due after the utility services were delivered. *Cody*, at 1113–14. *Accord, Goreham v. Des Moines Metro Area Solid Waste Agency*, 179 N.W.2d 449, 457 (Iowa 1970). Here, the lack of an ownership interest coupled with the "dry hole" risk preclude a similar result.

It is instructive to review this court's previous analysis of a project based upon RCW 54.44 because it demonstrates the application of that statute to a viable project. In *PUD 1*

*v. Taxpayers of Snohomish Cy.,* 78 Wn.2d 724, 479 P.2d 61 (1971), we analyzed the joint development, by both public and private participants, of a coal–powered electric generating plant under the authority of RCW 54.44. Our decision concerned constitutional questions rather than statutory authority because the agreement was negotiated to conform to RCW 54.44. In challenging the agreement, appellants alleged that the PUD participants violated Const. art. 8, § 7 by giving or loaning credit in aid of their private coparticipants or by impermissibly owning stocks in a private corporation. This court found the arrangement valid under the constitution, reasoning that because under the statutory requirements the public participants were severally liable for their own acts and could not be assessed for the obligation of other participants, the public participants were not loaning or giving credit. *Snohomish Cy.,* at 726–27. As the court characterized the agreement: "[r]espondents are purchasing an ownership interest, and not only is their liability limited to their own acts, but their investment is restricted to an indebtedness proportionate to their individual participation." *Snohomish Cy.,* at 728. Those same procedural safeguards are not only absent from the present arrangement, they are explicitly contradicted under the step–up provision included in section 17(c) of the Participants' Agreement and the definition of project capability in section 1(v).

## VI
### CONCLUSION

◼ We recently reaffirmed the application of the ultra vires doctrine in the area of government contracts. *Noel v. Cole,* 98 Wn.2d 375, 655 P.2d 245 (1982). As a general rule, the unauthorized contracts of governmental entities are rendered void and unenforceable under the ultra vires doctrine. *Noel,* at 378. The doctrine applies to government action to "protect the citizens and taxpayers . . . from unjust, ill–considered, or extortionate contracts, or those showing favoritism . . ." 10 E. McQuillin, *Municipal Cor-*

*porations* § 29.02, at 200 (3d ed. 1981). Also, "[t]he rationale for the rule is the protection of those unsuspecting individuals whom the entity represents." *Noel,* at 378. In *Noel* this court held a logging contract between the State Department of Natural Resources and a private company ultra vires because of the parties' failure to conform to mandatory statutory procedures.

In the present case, the participants lacked substantive authority to enter into this type of contract because they constructed an elaborate financing arrangement that required the participants to guarantee bond payments irrespective of whether the plant was ever completed; to surrender ownership interest and considerable control to WPPSS; and to assume the obligations of defaulting participants. As such, these contracts failed to protect unsuspecting individuals, the ratepayers, represented by the participants. By choosing such an alternative arrangement in lieu of a statutory scheme that incorporated protections against those very liabilities, the participants exceeded their statutory authority, rendering the contracts ultra vires.

Although we have discussed our conclusions throughout the opinion, it is helpful to summarize. It should be apparent that this agreement does not satisfy the statutory scheme governing the public participants. (1) The agreement is not a standard contract for the purchase of power because the payments are due irrespective of whether any electric current is delivered. (2) It is not the type of acquisition or construction of a generating project authorized by the statutes or previously recognized by this court, because the participants retained no ownership interest, except in any excess assets upon termination, and a very limited role in management of the project. (3) It is not an exercise of an implied power to pay for municipal services because there was no guaranty the services would be provided and we perceive no legal necessity for such powers. (4) Finally, it is not a joint operating agreement within the provisions of RCW 43.52 because those provisions limit the participants'

ability to buy anything more than "electric energy."

Our conclusion is that the Washington statutes authorize the participants to purchase power or to own electric generating facilities. An attempt to structure an agreement under the joint operating agency statutes or to base it upon implied powers does not alter that basic authority and the participants simply are not authorized to guarantee another party's ownership of a generating facility in exchange for a possible share of any electricity generated. Therefore, we hold that the Washington PUD's and Washington municipal participants lacked authority to enter into this agreement.

The trial court ruling that the Washington PUD's, cities and towns had authority to enter into this agreement is reversed.

WILLIAMS, C.J., ROSELLINI, DIMMICK, and PEARSON, JJ., and MORGAN, J. Pro Tem., concur.

DORE, J. (concurring)—I concur in the result reached by the majority. For the reasons discussed below, I am compelled to add my own analysis to that proffered by the majority.

## I

I agree with the majority that "this court has never found authority for a project in which the participants did not have an ownership interest". Majority, at 785. Unlike the majority, however, I do not find it necessary to examine the present agreement to determine whether the participants retained sufficient control over the project to constitute the "equivalent" of an ownership interest. Majority, at 787. "Ownership" has been defined as the "complete dominion, title, or proprietary right in a thing or claim". Black's Law Dictionary 997 (5th ed. 1979). I believe an ownership interest is an *absolute* requirement when acquiring or constructing generating facilities.

If the parties had wished to become co-owners of the projects, with the participants sharing in the benefits and

burdens of ownership, they would have structured the contract according to RCW 54.44, governing joint ownership of nuclear power plants. This is the statutory framework which governs the ownership agreement between Washington Public Power Supply System (WPPSS) and Pacific Power and Light Company (PP&L), which owns 10 percent of project 5. RCW 54.44, however, is not the statutory framework governing the relationship between WPPSS and the 88 participants. That relationship is governed by RCW 43.52. Under that chapter, WPPSS is authorized to construct and operate the projects and can sell electrical output to other utilities.

This court has held that the power to incur indebtedness cannot be inferred or implied from general statutory authority permitting municipalities to enter into contracts. In *Edwards v. Renton,* 67 Wn.2d 598, 409 P.2d 153, 33 A.L.R.3d 1154 (1965), we made clear the need for express statutory authority for municipalities to enter into financial arrangements. As the present majority notes, other states have provided explicit statutory authority for unconditional guaranties such as the one in the present case. The Legislature of the State of Washington, however, has *not* provided our state with such statutory authority. Actual ownership is essential.

Under the "equivalent of ownership interest" analysis employed by the majority, project designers could conceivably allow enough democratic control by participants that there would be authority for a project which the participants did not actually own. I would hold that *both* an ownership interest *and* active participation in the management of the facilities are mandatory.

## II

The dissent fails to address the constitution and statutes

of this state which specifically limit the amount of indebtedness that a municipality can incur. Article 8, section 6 of the Washington State Constitution provides that a municipality shall not become indebted in an amount in excess of 1½ percent of the value of the taxable property of that municipality without the assent of three–fifths of the voters therein, nor under any circumstances incur indebtedness in excess of 5 percent of the value of the taxable property therein. The power of municipalities to incur indebtedness has been further circumscribed by the Legislature. RCW 39.30.010 and RCW 39.36.020(2), for example, prohibit cities incurring debt exceeding three–fourths of 1 percent of their assessed property value without first obtaining permission from their citizens by a public vote.

By the terms of the Participants' Agreement, each participant committed itself to buy from WPPSS a share of "project capability". The price was a share of the cost of the project to WPPSS. For 10 participant Washington cities, the share of the anticipated price which each committed itself to pay exceeded the debt allowable by law.[6] No public vote approved any of these undertakings.

The public policies behind these debt limitations are not in doubt. As stated in 56 Am. Jur. 2d *Municipal Corporations* § 599, at 651 (1971):

> The clear and unmistakable purpose of such provisions is effectually to protect persons residing in municipalities or counties from the abuse of their credit and the consequent oppression of burdensome, if not ruinous, taxation.

*Accord,* 15 E. McQuillin, *Municipal Corporations* § 41.02 (3d ed. 1970); *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 211 P.2d 651 (1949).

I am not persuaded by the trial court's determination

---

[6]These cities include Richland, Tacoma, Blaine, Centralia, Ellensburg, McCleary, Port Angeles, Steilacoom, and Sumas. The magnitude of the commitments range from almost 7 times the allowable debt in the case of Port Angeles to almost 36 times what the statutes would permit in the case of McCleary.

that, because the obligations of the public utility district participants were payable out of electric utility revenues, they were exempt from constitutional scrutiny under the special fund doctrine. The trial court's rationale ignores the purpose of the special fund doctrine and provides a glaring loophole by which clever draftsmen could escape the constitutional debt restrictions.

The special fund doctrine was last addressed by this court in *State ex rel. State Fin. Comm. v. Martin*, 62 Wn.2d 645, 661, 384 P.2d 833 (1963):

> That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But the true test of its application here is not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, or the operation of the State Liquor Control Board, or from sales or leases of publicly owned lands, any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state. *Hence, we must take care that the employment of peripheral doctrines does not lead us away from the main point of the case. What is a debt of the State of Washington? Any obligation which must in law be paid from any taxes levied generally is, we think, a debt of the state.* It matters little whether the tax be ad valorem or an excise.

(Italics mine.) Thus, the special fund doctrine is to be analyzed in terms of the purpose for the constitutional limitation. The employment of "peripheral doctrines," as noted above, should not detract from the primary purpose of concern: does the device employed create the evil the constitutional limitation was designed to avoid? If such is the case, there is "debt" for constitutional analysis purposes.

Traditionally this court has not applied the special fund doctrine mechanically. This point is illustrated by the case

of *Twichell v. Seattle,* 106 Wash. 32, 179 P. 127 (1919) where the City of Seattle issued bonds to purchase an already existing street railway system as an addition to the city's railway system. The City had pledged to pay the bonds out of the revenues of the city's entire railway system, not just out of that portion of the system being purchased by the proceeds of the bonds. Rather than applying a mechanical rule, the court focused on the risk to the taxpaying public. As the addition being purchased was already existing and operating in the hands of a private company, it was obvious this was not a speculative venture which might fail to materialize. Thus, the reason for the application of the debt limitation did not exist, and the obligation was not considered to be constitutional debt.

This court reached just the opposite result in *State ex rel. State Bldg. Fin. Auth. v. Yelle,* 47 Wn.2d 705, 289 P.2d 355 (1955). That case involved the State Building Financing Authority (Authority) which would purchase land, build buildings, then lease the buildings to various state departments and agencies for a rental fee designed to cover the debt service on bonds issued by the Authority to pay for the buildup. The Authority's sole source of income was the rentals for the buildings, and the bonds were payable out of those rental receipts. Applied mechanically, the special fund doctrine would save the scheme from constitutional attack, because the debt was payable solely out of the revenues of the projects being financed. Yet this court looked to the substance of the transaction, rather than to its form. The court held that the special fund doctrine did not apply because some of the rents were paid out of general tax revenues. The court found the taxpaying public was taking the risk:

> When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation.

47 Wn.2d at 715.

The facts of the present case are very similar to the State Building Financing Authority case. Here, WPPSS played the role of a financing conduit for the participants, just as the Authority was a financing conduit for the State. Just as the Authority attempted to issue "revenue" bonds that were, in fact, secured by the Legislature's promise to appropriate funds adequate to pay debt service, so WPPSS has issued "revenue" bonds that are, in fact, secured by the participants' promise to collect funds adequate to pay debt service, notwithstanding the noncompletion of the facilities (plants 4 and 5). This court cannot insulate third party conduit financier schemes from the constitutional safeguard of the debt limitation.

## III
### Section 6(d)

The Participants' Agreement does not specify that the participants must pay for either decommissioning costs or debt service if the plants are not completed and operating. Section 6(d) provides that the participants must make the payments called for under the Agreement whether or not the projects are completed, but doesn't specify what payments are called for. The Agreement provides that the participants have to pay their respective shares of whatever is in the Annual Budget, as defined in section 1(a) of the Agreement. The ultimate issue is whether the Annual Budget includes *debt service* and *decommissioning costs* if the projects are terminated before completion and before they go into operation generating electricity.

### Debt Service

The bonds in question are "revenue" bonds, not general obligation bonds, and payable solely out of any revenues to be generated by the projects. If the projects for which revenue bonds are sold do not generate revenues, the bonds are not paid. The bonds themselves and the Bond Resolution clearly provide that, except for interest during construction, the bonds are payable solely out of revenues to be earned by WPPSS from the sale of "power and energy" (that is,

electricity) from the plants. Because the plants are unfinished, there is no electricity to sell, and hence no revenues. There is no obligation to pay revenue bonds where there are no revenues.

It is not difficult to determine why the bonds were issued as revenue bonds rather than general obligation bonds. The statutes governing WPPSS allow it to issue revenue bonds "payable from the revenues of the utility properties operated by it" (RCW 43.52.3411) and expressly prohibit it from issuing general obligation bonds (RCW 43.52.391). The reason that the Legislature allowed WPPSS to issue revenue bonds but not general obligation bonds was to guard against precisely the situation now before this court: the economic, political and legal problem of asking the citizens of Washington and its neighboring states to pay billions of dollars for failed projects which will never produce any revenues. If the bonds were general obligation bonds, the risk of project failure would be on citizens who would have been entitled to vote on whether to undertake the project risks. Because the bonds are labeled as revenue bonds, however, the risk of project failure should be on the investors who bought the bonds knowing the sole source of payment was to be the revenues from the sale of electricity which was expected to be generated.

The Participants' Agreement must be read in light of the statutory framework governing WPPSS and the participants. If the parties had wished to become co-owners of the projects, with the participants sharing in the benefits and burdens of ownership (such as the risk of failure), they would have structured the contract according to RCW 54.44 governing joint ownership of nuclear power plants. That is the statutory framework which governs the ownership agreement between WPPSS and PP&L whereby WPPSS owns 90 percent and PP&L owns 10 percent of project 5. However, RCW 54.44 is *not* the statutory framework governing the relationship between WPPSS and the 88 participants. That relationship is governed by RCW 43.52, which does not allow WPPSS to put an ownership risk on the

purchasers of that electric energy.

## DECOMMISSIONING COSTS

As the projects were terminated before completion, decommissioning costs should be excluded from the Annual Budget as "costs of construction," and should be paid out of the construction fund provided, not by participants.

The trial court decided as a matter of law that the Agreement requires the participants to pay WPPSS for decommissioning costs as part of the Annual Budget. That is plainly contrary to the clear language of the Agreement and Resolution.

The Annual Budget excludes "costs of construction as defined in the Bond Resolution". Section 1(a) of the Agreement, at 3 and 4. Section 6.9(J) of the Bond Resolution, at pages 46 and 47, specifically includes as a cost of construction:

> The *costs of decommissioning* any Project terminated prior to the [completion of construction], which costs shall include but shall not be limited to all of the System's accrued costs and liabilities, including cost of Fuel, of such Project and the salvage, discontinuance and disposition thereof . . .

(Italics mine.)

Costs of decommissioning the projects if they are terminated prior to completion are "costs of construction as defined in the Bond Resolution" and, therefore, are excluded from the Annual Budget. Section 6.9(J) of the Bond Resolution, at 46; section 1(a) of the Participants' Agreement, at 3.

The trial court's reasoning ignores the fundamental scheme of the Participants' Agreement and Bond Resolution and is contrary to the plain language of the documents. The Resolution explicitly provides that (1) costs of construction shall be paid from moneys in the construction fund (section 6.9, at 44); (2) the moneys in the construction fund will come from the sale of bonds (section 6.8, at 43), and (3) WPPSS shall sell enough bonds to pay all costs of construction (section 3.2, at 17). WPPSS' chief New York

bond lawyer, who drafted the documents, testified:

Q. Where does the money come from that gets into the construction fund?

A. From bond proceeds.

Q. As you interpret the bond resolution does any money which the participants are to pay to the Supply System ever get into the construction fund?

A. I don't believe so.

. . .

Q. Does the bond resolution provide that . . . all costs of construction are to be paid from monies in the construction fund?
                [Objection]

A. Yes.

Clerk's Papers, at 705–06.

When they signed the Participants' Agreement in 1976, the participants agreed to pay for items properly includable in the Annual Budget but not for "costs of construction," which were expressly *excluded* from the Annual Budget. The exclusion was no accident: the exclusion language was specifically *added* to earlier drafts of the Agreement to insure that the participants would not have to pay such costs.

The draft of September 24, 1974 shows the following handwritten note made by one of WPPSS' lawyer–draftsmen next to the construction cost exclusion:

make sure annual budget only include[s] costs of ea. project after D. of Co. Op. [Date of Continuous Operation, *i.e.,* completion] or date certain [July 1, 1988].

Clerk's Papers, at 4373. Thus, if there is any doubt about the parties' intent, the extrinsic evidence from the files and testimony of WPPSS' own lawyers who drafted the documents shows that precompletion costs, such as costs of decommissioning uncompleted plants which by definition are "costs of construction," were intended to be *excluded* from the Annual Budget. They were to be paid from bond proceeds in the construction fund, not by the participants.

The costs of "termination" are mentioned in the second sentence of the definition of "Annual Budget". It provides

for "costs . . . resulting from the ownership, *operation* and *maintenance* of the Projects, repairs, renewals, replacements, and additions thereto and costs of termination thereof as provided in Section 13". (Italics mine.) Participants' Agreement, at 4. It is clear from the context that the sentence refers to *completed* plants. Only completed plants have operation and maintenance costs, or need repairs, renewals, replacements or additions.

Moreover, if the reference to costs of "termination" was construed to embrace precompletion decommissioning costs, there would be an absolute and unavoidable contradiction between the first sentence (which excludes precompletion decommissioning costs as "costs of construction") and the second sentence. If possible, an agreement should be interpreted in a way which will avoid such inherent contradictions.

Thus, all costs of construction as defined in the Bond Resolution, such as costs of decommissioning uncompleted plants, are excluded from the Annual Budget because they are to be paid out of the bond proceeds in the construction fund, not by the participants. Additionally, costs of "termination . . . as provided in section 13" are included in the Annual Budget only after a project has been completed and has gone into operation before being terminated. Accordingly, I strongly disagree with the trial court's conclusion that as a matter of law the Agreement unambiguously includes the costs of decommissioning uncompleted plants in the Annual Budget.

Even if decommissioning costs were payable under section 13 of the Agreement, they are not payable until WPPSS renders a final accounting statement. As costs of decommissioning uncompleted plants are to be paid out of the construction fund, not by the participants, the participants can be called upon to pay decommissioning costs only after a plant has been completed and has gone into operation before being terminated. Once a plant is completed, the costs of decommissioning it would no longer be a "cost of construction" under section 6.9(J) of the Bond Resolu-

tion. Hence the decommissioning costs would not be payable out of the construction fund and would have to be paid by the participants under section 13 of the Participants' Agreement.

Section 13(a)(iii), however, clearly provides that decommissioning costs are payable by the participants only after WPPSS renders a "final accounting statement" at the end of the decommissioning process. The monthly accounting statements required under section 13(a)(ii) are for reporting purposes only. Significantly, the earlier drafts of the Agreement (Clerk's Papers, at 4283, 4321, 4357, 4399, 4452, and 4548) all required monthly payments based on the monthly accounting statements, but the drafts of February 27, 1975 and later deleted the monthly payments and based the payments solely on the final accounting statement. Clerk's Papers, at 4602 and 4768, and Agreement section 13(a)(ii) and (iii). Presumably, the Agreement does not require participants to pay for decommissioning costs until the final accounting statement is rendered because it cannot be known until then whether the ultimate result of decommissioning will be a debit or credit for the participants.

Thus, as discussed above, the section 13 payment provisions do not apply in the present context or precompletion decommissioning. Even if they did apply, the participants would not have to pay for decommissioning costs until WPPSS had rendered a final accounting statement at the end of the decommissioning process.

## CONCLUSION

From reading the record, it is clear that the monumental crisis brought on by WPPSS was created by the simultaneous construction of five nuclear plants, as well as mismanagement. To save itself, WPPSS has asked us to approve a plan to mortgage the futures of ratepayers by requiring huge increases in electricity rates, in exchange for nothing, in violation of our statutes and state constitution.

This we cannot do.[7]

I concur in the result of the majority.

UTTER, J. (dissenting)—I dissent. The majority, by its narrow reading of municipal authority to provide electric power, places constraints on municipalities not intended by the Legislature. Municipal authority in this area must be read broadly to provide the flexibility which is absolutely crucial in furnishing such a capital–intensive service. The contractual arrangement in the present case is a form of purchase which, viewed at the time the contract was made, may well have been the most economically advantageous for all concerned. While the result has been tragic, the decision here today may not free municipalities of all potential costs in even the present case, will bar them from potentially advantageous contracts in the future, and may well make financing of future projects more costly.

It is natural for anyone viewing the enormity of the mismanagement in this project and the calamitous impact of its failures on utilities and ratepayers to seek ways to negate the impact. Nonetheless, I cannot agree that the approach taken by the majority is either a proper or necessary way to solve the problem.

Initially, it is important to characterize exactly what it is that the participants contracted for. As the majority points out, the contract cannot be characterized as purchase of an ownership interest in a power plant, for the interest held by the participants lacks several important indicia of ownership. Neither does the contract represent a purchase, in the

---

[7]Citing RAP 13.7, the writer of the dissenting opinion limits himself to the statutory authority questions presented by the parties. I do not find RAP 13.7 applicable, as it specifically pertains only to issues to be considered by this court upon acceptance of review of a Court of Appeals decision. Even if applicable, however, RAP 13.7 permits this court to limit the issues only at the time of the granting of the motion or petition, not after oral presentation.

I find it impossible to discuss statutory authority without interpreting the Participants' Agreement and Bond Resolution, including section 6(d). The contract interpretation and statutory authority issues are so intertwined it is necessary to address the interpretation issues in determining the authority issues.

ordinary sense, of actual electric power, for it expressly provides for the possibility, which in fact has materialized, that no power would be produced.

Instead, the contracts are best characterized as a purchase of a *possibility* of power. In return for consideration in the form of guaranty of the revenue bonds, the participants received not guaranteed power but an exclusive right to power which might or might not materialize. The advantage to the participants was that this power might be significantly cheaper than available alternatives or might even be the *only* alternative available. While the contract has the disadvantage of requiring payment for a potential "dry hole", this is true of other standard contracts as well. For example, the buyer in an option contract may well end up paying something for nothing if, when the time comes for it to exercise the option, it chooses not to do so because the terms are no longer economically advantageous.

The majority concedes, as it must, that all of the participants have the authority to "enter into contracts or compacts . . . for the purchase and sale of electric energy". RCW 43.52.410. The issue before us is whether a proper construction of this language includes the purchase of a possibility of electric power. The majority simply concludes that it does not. I find the issue more difficult.

Statutes such as RCW 43.52.410 are to be liberally construed so as to further their purpose of furnishing power to the people. *State ex rel. PUD 1 v. Wylie*, 28 Wn.2d 113, 146, 182 P.2d 706 (1947); RCW 43.52.910. *See generally Pacific Cy. v. Sherwood Pac., Inc.*, 17 Wn. App. 790, 795, 567 P.2d 642 (1977) (statutes relating to the public health and welfare should be liberally construed). As was noted by another court in a similar case:

> The legislature has clearly pointed up that it intended to extend liberally to municipal electric utilities the same benefits and efficiency available to other utilities, through combined ownership of a generating system. It would be an impossible and impracticable demand for us to insist on the legislature providing every little detail on how to

go about carrying out an authority bestowed. In the absence of some good reason to do so, we should not apply a construction which would nullify, destroy or defeat the intention of the legislature.

*Frank v. Cody,* 572 P.2d 1106, 1115 (Wyo. 1977).

In light of this rule of liberal construction, I believe this court should construe RCW 43.52.410 to authorize purchase of a possibility of power as well as more typical purchase contracts. Such contracts may in some circumstances be highly advisable. Option contracts, especially when used in an unpredictable market in which periodic gluts and shortages are common, are a good example. Several years ago, for example, a municipality operating an oil–burning power plant seemingly might have been well advised, in the face of escalating oil prices, to enter a long–term contract to purchase oil at the then prevailing price. Yet in light of recent price declines, such a contract would have left the municipality bound to pay significantly more than the current price. The solution—an option contract which would permit the municipality, by exercising its option, to avoid any price increases and yet still, by choosing not to exercise its option, take advantage of any price declines.

The purchase of a possibility of power in the present case no doubt seemed equally advisable in 1974, when steadily rising energy prices were predicted and the costs of the proposed power plants seemed manageable. That a loose market and other economic factors made completion of the plants infeasible and required their termination is no different from a fall in oil prices which might make the hypothetical purchase option described above economically worthless. The participants are no more entitled to a refund of their consideration here, *i.e.,* relief from their bond guaranties, than they would be entitled to a refund of the consideration paid for the option contract. As RCW 43.52.410 should permit option contracts, so it should permit agreements such as that in the present case.

Further support for this conclusion is provided by the Legislature's failure to react at all to the well publicized

contracts at issue here. WPPSS is a public entity which is purely a creature of statute. *See* RCW 43.52. Legislative acquiescence in such an entity's interpretation of the statutes under which it operates is a significant indication of legislative intent. *Cf. Washington Educ. Ass'n v. Smith,* 96 Wn.2d 601, 606, 638 P.2d 77 (1981) (legislative acquiescence in Attorney General interpretation); *Spokane Methodist Homes, Inc. v. Department of Labor & Indus.,* 81 Wn.2d 283, 287, 501 P.2d 589 (1972) (legislative acquiescence in court interpretation); *Morin v. Johnson,* 49 Wn.2d 275, 279, 300 P.2d 569 (1956) (legislative acquiescence in interpretation by administrative agency). The various purchasers of bonds undoubtedly relied on legislative acquiescence in this case.

Other courts which have considered the validity of contracts containing comparable "dry hole" provisions have reached conclusions similar to mine. While most of those cases are factually distinguishable, they are unanimous in upholding such provisions. *See Board of Comm'rs v. All Taxpayers, Property Owners, & Citizens,* 360 So. 2d 863 (La. 1978); *State ex rel. Mitchell v. Sikeston,* 555 S.W.2d 281 (Mo. 1977); *Johnson v. Piedmont Mun. Power Agency,* ___ S.C. ___, 287 S.E.2d 476 (1982); *State ex rel. Grimes Cy. Taxpayers Ass'n v. Texas Mun. Power Agency,* 565 S.W.2d 258 (Tex. Civ. App. 1978); *Frank v. Cody, supra. State ex rel. Mitchell v. Sikeston, supra,* actually involved a fact situation almost identical to that in the present case. There, four cities entered into contracts with a neighboring city whereby they agreed to pay for a specified quantity of electric power whether or not actually needed *and whether or not actually available. Mitchell,* at 283–84. Despite this "dry hole" provision and a complete lack of any ownership interest at all, the court did not even question the authority of the purchaser cities. *See Mitchell,* at 291.

We should reject the majority's narrow interpretation of RCW 43.52.410. Municipalities exercising their authority to provide electric power to their citizens must be given the freedom and flexibility to use all advisable means. Their

determinations of advisability, moreover, are not subject to judicial review, except to the extent that they are arbitrary and capricious. *See State ex rel. PUD 1 v. Schwab,* 40 Wn.2d 814, 829–31, 246 P.2d 1081 (1952). I would hold that the participants did possess authority to enter into the contracts at issue here.

I will not respond to the concurring opinion. There are compelling reasons for determining the issues of law addressed in that opinion in a different manner. Some of these were stated by the trial court; others were presented to us in oral argument and in the briefs of the parties.

Because the majority has deliberately chosen to refrain from addressing these remaining issues (see majority opinion at 781, footnote 1), I do so as well. However, our silence should not be mistaken for acquiescence in the views of the writer of the concurring opinion. RAP 13.7(b) expressly authorizes us to limit the issues which we address in reviewing an opinion of the Court of Appeals and this must encompass the power to so limit our review at any time prior to issuing a decision. While RAP 2.4, which governs direct discretionary review, does not expressly allow such limitation, such power must be implied in light of RAP 13.7(b) and the nature of discretionary review. *See also* RAP 18.8(a) (appellate court may waive or alter Rules of Appellate Procedure). To hold otherwise would allow a party seeking discretionary review to force an appellate court to choose between reviewing none or all of numerous issues that party might present. This would conflict with the basic concept of discretionary review, that it is discretionary.

I dissent.

DOLLIVER, J., concurs with UTTER, J.

Reconsideration denied July 22, 1983.